**Kemp YARBOROUGH, Petitioner–Appellant,**

v.

**John P. KEANE, Superintendent, Sing Sing Correctional Facility, Respondent–Appellee.**

**No. 219, Docket 96–2166.**

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 1996.

Decided Dec. 10, 1996.

Richard D. Willstatter, White Plains, NY (Green & Willstatter), for Petitioner–Appellant.

Carolyn Pokorny, Assistant District Attorney, Bronx, NY (Robert T. Johnson, Bronx County District Attorney, Joseph N. Ferdenzi, Billie Manning, Assistant District Attorneys, of counsel), for Respondent–Appellee.

Before: OAKES, LEVAL and PARKER, Circuit Judges.

LEVAL, Circuit Judge:

Kemp Yarborough appeals from Judge Martin's dismissal of his petition for habeas corpus. During Yarborough's murder trial in New York State Supreme Court, the prosecutor notified the judge in a robing room conference that a prospective prosecution witness had been present in the courtroom, without the prosecutor's knowledge, while a police officer was testifying. Yarborough's attorney moved to disqualify the witness. The judge called in the witness and questioned him to determine whether the witness's testimony would be influenced by hearing the officer testify. Yarborough's counsel did not request that Yarborough be brought in for the hearing. The judge denied the motion to disqualify the witness.

Yarborough claims that holding this hearing in his absence violated his constitutional right to be present at all material stages of the proceedings and to confront the witnesses against him. We find that, if it was error to conduct the hearing in Yarborough's absence, the error was harmless. We therefore affirm.

## Background

Yarborough was charged with, *inter alia*, the murder of Keith Duncan. At trial, it was undisputed that Yarborough was involved in a fight between two groups of young men. After awhile the fight died down, and Yarborough walked away from the area. The prosecution evidence was that shortly after the fighting subsided, Yarborough returned, brandishing a gun, and fired three shots, two of which hit Duncan, who died of the wounds. After a brief chase, Yarborough was arrested by police officers who had witnessed the shooting.

Police Officer Orlando Torres testified that he was on patrol with his two partners in an unmarked car when he observed a group of young men arguing at the corner of 163rd Street and Third Avenue in the Bronx. Officer Torres saw four males coming down the street, heading toward the group. Leading the foursome was a young black male wearing a long dark coat and carrying a gun, who fired three shots into the crowd.

Torres testified that he immediately pulled the car up to the scene. As the officers got out of the car, the shooter turned toward them with the gun, then turned back around, and ran up the street. Torres chased the shooter, who threw the gun over a fence into a parking lot. Torres soon caught and arrested him. Torres and the other officers identified the shooter as the defendant, Kemp Yarborough.

Another officer promptly recovered the gun from the parking lot. Ballistics tests revealed that this gun fired the bullets that killed Duncan.

The morning after Officer Torres testified, the prosecutor notified the judge in a robing room conference that a prospective prosecution witness, Michael Garvin, a cousin of the deceased, had entered the courtroom without the prosecutor's knowledge and had been present during a portion of Torres's testimony. Defense counsel moved to preclude Garvin from testifying. The judge called Garvin into the robing room, and questioned him to determine whether he would be influenced by Torres's testimony. Yarborough's attorney also questioned Garvin. She made no objection to conducting the proceedings in Yarborough's absence. Garvin explained that, with one insignificant exception (the fact that a car was parked on the curb), he had not observed the events that Torres had testified about. He stated that hearing Officer Torres testify would not influence the testimony he was prepared to give. The trial judge determined that Garvin would not be influenced by Torres's testimony and denied the motion to bar his testimony. When trial resumed, Garvin testified. Neither Yarborough nor his attorney made any objection to the fact that Yarborough had been absent from the hearing.

Garvin did not see the shooting, but was present during the fight that preceded the shooting and heard the shots fired. According to Garvin, Yarborough, who was the only person present wearing a long denim coat, participated in a street fight with Duncan; at one point Duncan pushed Yarborough to the ground. Eventually the fight died down, and Garvin walked away. Shortly thereafter he heard three shots.

Officer Torres's two partners, Todd Majett and Bernard Malone, corroborated Torres's account of the events. Officer Majett testified that he observed four black males heading toward a group of youths on the corner of 163rd Street and Third Avenue. Leading them was a tall individual, whom he identified as Yarborough, wearing a long black coat. Majett saw flashes coming from a gun in Yarborough's hand and heard three shots. Majett testified that Officer Torres chased and caught Yarborough.

Officer Malone also testified that from the car, he saw four males running down the street toward a group of others. Yarborough, who was wearing a long dark coat, led these four and fired three shots. As Malone leapt out of the car, Yarborough turned toward the officers with the gun in his hand. Yarborough then started running back up the street, threw his gun over a chain link fence, and shortly thereafter was apprehended by Officer Torres.

The defense presented two witnesses. The first, Carlos Cordero, was arrested with the defendant. He testified generally about the fight that preceded the shooting and stated that Yarborough participated in the fight. He said, however, that Yarborough did not have a gun that evening.

The defense's second witness was Yarborough himself. He admitted that he was involved in the fight and that he punched a black male in the face during the fight. He also testified that he was wearing a long black denim coat. He denied shooting anyone or having a gun that night. He testified that after the fighting stopped, he had walked away from the area and then heard shots ring out from behind him.

The jury convicted Yarborough of, among other things, murder in the second degree.

On appeal to the Appellate Division, Yarborough raised, for the first time, his contention that his absence from the robing room hearing violated his constitutional right to be present during all material stages of the proceedings and to confront his accusers. The Appellate Division found that, "[c]ontrary to defendant's unpreserved argument on appeal, his exclusion from this hearing did not deprive him of his ... constitutional right to be present at any material stage of his trial." _People v. Yarborough_, 184 A.D.2d 394, 395, 585 N.Y.S.2d 372, 373 (1st Dep't 1992). The New York Court of Appeals denied leave to appeal. _People v. Yarborough_, 80 N.Y.2d 935, 589 N.Y.S.2d 863, 603 N.E.2d 968 (1992).

Yarborough then petitioned for habeas corpus, again alleging that his absence during the hearing violated his constitutional rights. Judge Martin disagreed and denied the petition. Yarborough then brought this appeal.

## Discussion

Yarborough's appeal raises three potential questions. First, were Yarborough's constitutional rights violated by holding the hearing in his absence? Second, if a violation did occur, does harmless error analysis apply? Third, if harmless error analysis does apply, was this harmless?

We hold that harmless error analysis does apply and that, if it was error to hold this hearing in Yarborough's absence, that error was harmless. These two findings make it unnecessary for us to pass on whether holding the hearing in Yarborough's absence violated his constitutional rights.

### I. Does Harmless Error Analysis Apply?

In _Arizona v. Fulminante_, 499 U.S. 279, 307–10, 111 S.Ct. 1246, 1263–65, 113 L.Ed.2d 302 (1991), in an opinion by Chief Justice Rehnquist, the Supreme Court distinguished between two classes of constitutional errors: the vast majority, denominated "trial errors," which are subject to harmless error review, and a very limited class of errors, called "structural," which require automatic reversal regardless whether the error had any appreciable effect on the outcome of the trial. _See also Rose v. Clark_, 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (noting that some constitutional violations are not subject to harmless error review but emphasizing that "they are the exception and not the rule"). The Court explained that structural errors are those errors which "transcend[ ] the criminal process," "affecting the framework within which the trial proceeds." _Fulminante_, 499 U.S. at 309–11, 111 S.Ct. at

1265; *see also Rose*, 478 U.S. at 577, 106 S.Ct. at 3106 (explaining that some errors are not subject to harmless error review because they "necessarily render a trial fundamentally unfair"); *Vasquez v. Hillery*, 474 U.S. 254, 263–64, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986) (errors which "undermine[] the structural integrity of the criminal tribunal" are not subject to harmless error review). Errors are properly categorized as structural only if they so fundamentally undermine the fairness or the validity of the trial that they require voiding its result regardless of identifiable prejudice. *See Fulminante*, 499 U.S. at 309–10, 111 S.Ct. at 1265. To illustrate the distinction between the two categories of errors, the Court pointed to numerous cases in which it had found constitutional violations subject to harmless error review, and contrasted those cases with the few examples of violations, such as the total deprivation of the right to counsel and trial by a biased judge, which it had found to require automatic reversal. *Fulminante*, 499 U.S. at 306–10, 111 S.Ct. at 1263–65 (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) and *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) as examples of structural errors).

■ To determine whether Yarborough's exclusion from the hearing is structural or trial error, we begin by examining Chief Justice Rehnquist's analysis of the taxonomy in *Fulminante*. We do not understand *Fulminante*'s list of examples of violations that have been held exempt from harmless error review to mean that any violation of the same constitutional right is a "structural defect," regardless whether the error is significant or trivial. Nor does the fact that the Supreme Court has applied harmless error analysis to one level of violation of a particular right necessarily mean that even the most egre-

gious violations of that right would also require demonstrated prejudice. Unless the Supreme Court has held otherwise, errors of a quality that undermines the structural integrity and fairness of the proceeding might be deemed structural, notwithstanding that less significant violations of the same constitutional right have been subjected to harmless error analysis. To determine whether an error is properly categorized as structural, we must look not only at the right violated, but also at the particular nature, context, and significance of the violation. *See Hegler v. Borg*, 50 F.3d 1472, 1476 (9th Cir.1995).

The examples cited by the Supreme Court in *Fulminante* support this understanding. *Fulminante* distinguishes between errors of sufficient magnitude or significance that they call into question the validity of the proceeding and are therefore deemed structural, and trivial violations of the same rights which are not. Thus, *Fulminante* lists the "total deprivation of the right to counsel" as a structural error, 499 U.S. at 309, 111 S.Ct. at 1265 (citing *Gideon*), but at the same time notes that a less significant denial of the right to counsel (at a preliminary hearing) has been held to be subject to harmless error review. 499 U.S. at 307, 111 S.Ct. at 1263 (citing *Coleman v. Alabama*, 399 U.S. 1, 10–11, 90 S.Ct. 1999, 2003–04, 26 L.Ed.2d 387 (1970)). Similarly, *Fulminante* cited *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), as an example of a presence violation subject to harmless error review. 499 U.S. at 307, 111 S.Ct. at 1263. In *Rushen*, a defendant's absence from two conversations between the trial judge and a juror was held to be harmless error. 464 U.S at 120–21, 104 S.Ct. at 456–57. That very opinion, however, makes clear that in egregious circumstances a violation of the right of presence might be exempt from harmless error review.[1] *See Rushen*, 464

---

1. Each of the constitutional violations listed in *Fulminante* as an example of structural error was a substantial violation of the right involved. We see no reason to suppose that in giving these examples, the Supreme Court meant that a trivial violation of the particular right would also require *per se* reversal. *Fulminante* notes, for example, that the exclusion of the public, without justification, from the entirety of a crucial seven-day suppression hearing is structural error. *See*

*Fulminante*, 499 U.S. at 310, 111 S.Ct. at 1265 (citing *Waller v. Georgia*, 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 2217 n. 9, 81 L.Ed.2d 31 (1984)). It does not necessarily follow, however, that the Supreme Court would find structural error and automatically vacate a conviction if the judge granted a motion to close the courtroom for a hearing, took a few minutes of innocuous introductory testimony, and then reconsidered, reversed the ruling and reopened the hearing to

U.S. at 117 n. 2, 104 S.Ct. at 455 n. 2 (explaining that "violations of the right to be present during all critical stages of the proceedings" are, "as with most [violations of] constitutional rights, ... subject to harmless-error analysis, *unless the deprivation, by its very nature, cannot be harmless*") (emphasis added) (internal citations omitted). We therefore do not read *Rushen* as supporting the proposition that unjustified exclusion of the defendant from the entire trial would be subject to harmless error review.

We turn to the question whether holding a brief hearing in the defendant's absence to determine whether a witness should be disqualified because he heard another witness's testimony constitutes structural error. The Supreme Court has listed violations of the Confrontation Clause as trial error subject to harmless error review. *See Fulminante*, 499 U.S. at 307, 111 S.Ct. at 1263 (citing cases). Similarly, *Rushen* and *Fulminante* make clear that absence of the defendant from a peripheral proceeding of secondary importance is subject to harmless error review. *See Fulminante*, 499 U.S. at 307, 111 S.Ct. at 1263 (citing *Rushen* and listing violations of the "defendant's right to be present at trial" as trial error subject to harmless error review); *Rushen*, 464 U.S. at 117–19 & n. 2, 104 S.Ct. at 454–56 & n. 2. *See also United States v. Fontanez*, 878 F.2d 33, 37–38 (2d Cir.1989) (subjecting presence violations to harmless error analysis where defendant was absent during read back of jury instructions and giving of modified *Allen* charge, but finding that error was not harmless); *United States v. Toliver*, 541 F.2d 958, 964–66 (2d Cir.1976) (finding that defendant's absence during the testimony of two witnesses was harmless).

Nonetheless, as the Ninth Circuit observed:

> *Fulminante* and *Rushen* require us to consider the nature of a "presence error" in

the context of the specific proceeding from which the defendant was excluded. In the usual case, such an error will be susceptible to harmless error analysis, but a defendant's absence from certain stages of a criminal proceeding may so undermine the integrity of the trial process that the error will necessarily fall within that category of cases requiring automatic reversal.

*Hegler*, 50 F.3d at 1476.

This is not a case in which the defendant's absence undermined the fundamental integrity of the criminal process. In this case, as in *Rushen*, the proceeding held in the defendant's absence was of minimal importance. The hearing was extremely brief and was not even a part of the trial proper. Garvin's testimony, as explained below, was of little significance. Furthermore, there is no legal right to the disqualification of a witness based on the witness's presence in the courtroom during the testimony of another witness. *See People v. Cody*, 182 A.D.2d 1089, 1089, 583 N.Y.S.2d 77, 77 (4th Dep't 1992); *People v. Rivera*, 182 A.D.2d 1092, 1093, 583 N.Y.S.2d 78, 78 (4th Dep't 1992); *People v. Lloyde*, 106 A.D.2d 405, 405, 482 N.Y.S.2d 326, 326 (2d Dep't 1984); *People v. Gifford*, 2 A.D.2d 634, 634, 151 N.Y.S.2d 980, 981 (3d Dep't 1956).

The absence of the defendant from a hearing under these circumstances does not call into question the fundamental fairness of the trial. It did not "affect[ ] the [structural] framework within which the trial proceeds." *Fulminante*, 499 U.S. at 310, 111 S.Ct. at 1265. If this incident was error, it was of such minimal importance to the fair structure of the criminal proceeding that it cannot fall within *Fulminante*'s classification of structural errors. It is therefore subject to harmless error analysis. *Fulminante*, 499 U.S. at 310, 111 S.Ct. at 1265.

the public. *Cf. Peterson v. Williams*, 85 F.3d 39 (2d Cir.) (brief and inadvertent continuation of proper courtroom closure, not noticed by any of the trial participants, although not permitted by law did not rise to the level of a constitutional violation), *cert. denied*, —— U.S. ——, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996). Similarly, the ruling that a criminal trial presided over by a

judge who has a pecuniary interest in the outcome requires *per se* reversal, *see Fulminante*, 499 U.S. at 309–10, 111 S.Ct. at 1265 (citing *Tumey*), does not suggest that a conviction obtained before an *impartial* judge would be vacated because the defendant had earlier been arraigned and his plea of not guilty taken before a judge who had a financial interest.

## II. *Was This Harmless?*

 On collateral attack, federal courts reviewing claims, other than those of structural error, ask whether the alleged error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). We conclude that Yarborough's absence from this hearing had no such effect or influence. The hearing was devoted to the issue whether Garvin would be permitted to testify. As it turned out, Garvin's testimony was of virtually no significance in the trial. It would have made no difference whether he testified or not. This is so not only because Garvin's testimony was merely corroborative of what other prosecution witnesses established, but more importantly because in nearly all respects Garvin's testimony was expressly conceded by the defendant himself.

Garvin's testimony was that he had seen Yarborough fighting with Duncan, the murder victim. The fight had subsided and Garvin had walked away. Garvin heard shots but did not see who had done the shooting. Yarborough's testimony was quite similar. He acknowledged that he had been involved in the fight and had punched a black male. He, like Garvin, testified that soon after the fight subsided, he heard shots fired. Thus both the prosecution's and the defendant's evidence showed that Yarborough had initially been involved in the fight but then had distanced himself from Duncan before the shooting occurred. Beyond that, Garvin furnished no incriminating testimony. The only significant differences between the prosecution's evidence and Yarborough's related to events that occurred *after* the fight Garvin observed. In view of the fact that Yarborough admitted what Garvin testified to, it made no difference whether Garvin testified or not, and Yarborough's presence at the hearing seeking to bar Garvin's testimony could have had no practical effect on the result of the trial.

Furthermore, the identification of Yarborough as the killer, without reference to the testimony given by Garvin, who did not purport to have seen the killing, was overwhelming. The police officers, Torres, Majett, and Malone, all testified that they saw Yarborough fire three shots into the group. They testified that Yarborough turned toward them with the gun in hand, and then immediately turned around and began to run away. Torres briefly chased Yarborough, then caught and arrested him. In addition, Torres and Malone saw Yarborough throw the gun over a fence. The gun was promptly recovered and identified ballistically as the murder weapon. Finally, all these witnesses, including Yarborough, testified that Yarborough was wearing a long coat at the time.[2]

Given the lack of significance of Garvin's testimony (virtually all of which Yarborough admitted), and the overwhelming evidence of Yarborough's guilt, independent of Garvin's testimony, it made no difference whether Yarborough's counsel succeeded at the robing room conference in disqualifying Garvin as a witness. If it was error to conduct the hearing without the defendant being present (and we make no such ruling), the error was certainly harmless. It had no substantial or injurious effect or influence on Yarborough's case.

### Conclusion

We affirm the district court's denial of Yarborough's petition.

---

2. Yarborough's claim is not strengthened by the fact that Garvin described Yarborough's long denim coat as blue, while Yarborough (and the officers who arrested him) described it as dark or black. As Yarborough admitted he was involved in the fight that Garvin observed, Garvin's use of "blue" as opposed to "black" to describe Yarborough's long dark denim coat does not suggest that Garvin saw a different person. At most this suggests that at night and in different lights, a dark denim overcoat can be seen by some as blue and by others as black.