In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3255, 99-3295 & 99-3492

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DRIEFUS HARBIN, a/k/a OMAR, HERMAN HICKS,
a/k/a HERM, and RADAR TYLER, a/k/a BIG DAR,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 98 CR 78--Rudy Lozano, Judge.

ARGUED NOVEMBER 2, 2000--DECIDED MAY 8, 2001

Before HARLINGTON WOOD, JR., RIPPLE, and
ROVNER, Circuit Judges.

ROVNER, Circuit Judge. This Court has
addressed many appeals related to the use
of peremptory challenges, but this one
appears unprecedented. Here, the
prosecutor was allowed to use a
peremptory challenge "saved" from the
jury selection phase to eliminate a juror
on the sixth day of an eight-day trial.
The defendants seek a new trial, arguing
that the prosecution's mid-trial use of a
peremptory challenge violated their Fifth
Amendment due process right to a fair
trial as well as their Fifth Amendment
right to the intelligent exercise of
their peremptory challenges. We agree.

I.

The defendants were charged along with
a number of others in a multi-count
indictment with conspiracy to possess
with intent to distribute and to
distribute 50 grams or more of crack
cocaine in violation of 21 U.S.C. sec.
846, use of a minor in the conspiracy in
violation of 21 U.S.C. sec. 861(a) & 18
U.S.C. sec. 924(j), possession with
intent to distribute in excess of five
grams of crack, in violation of 21 U.S.C.
sec. 841 (a)(1), and carrying a firearm
during a drug trafficking offense, in

violation of 18 U.S.C. sec. 924(c)(1). They proceeded to trial on the charges and the jury ultimately convicted all three of the conspiracy charge and one possession charge, convicted Hicks and Tyler of an additional possession charge, and acquitted them of the use of a minor and firearms charges. They now argue that the jury selection process was constitutionally deficient.

The process for exercising peremptory challenges began routinely enough, with the court declaring that after challenges for cause, each side could submit peremptory challenges for the potential jurors following questioning by the court. The court cautioned that "[t]hose jurors remaining in the jury box after challenges are exercised may not again be challenged except for cause." Tr. at Vol. 1, pp. 88-89. Following the challenges, the vacated seats would be filled with additional prospective jurors, and the process would be repeated. However, that process as set forth by the court was not followed on two occasions. The first occurred during pre-trial jury selection and is not before us on appeal. During pre-trial jury selection, two potential jurors who had survived the peremptory and cause challenges subsequently informed the court of conflicts regarding their ability to serve. One had a vacation scheduled to begin in nine days, and the other had day care problems. The court allowed the government to use peremptory challenges to strike both of those potential jurors, stating "you can use your peremptories because this is new information." Tr. at Vol. 1, p. 193. Defendant Tyler objected to that use of peremptory challenges, arguing that the late dismissal of those jurors put him at a disadvantage in the use of his own peremptory challenges, but he does not pursue that on appeal.

During that voir dire process, the district court allowed both parties to submit questions that the court wouldpresent to potential jurors, and the court clarified repeatedly that the failure to submit questions would constitute a waiver. Although the government later commented that it thought the court's typical voir dire asks about narcotics use, the government never submitted any such question and the potential jurors were never queried on

the subject.

   Ultimately, the defendants exhausted all of their peremptory challenges with two jury seats remaining to be filled. The government had not used all of its available peremptory challenges at the time that the jury selection process was completed. At the close of the jury selection process, both sides accepted the jury.

   On the sixth day of the eight-day trial, the court brought to the attention of the attorneys a note it had received from one of the jurors which read:

I, [Juror M]/1, felt it was my duty to let the Court know that one of the State's witnesses, I know his mom. I felt that I should make the Court aware of this. As my civic duty, I plan to carry on, with no intentions of being swayed because of this plight. Thanks, [Juror M].

With the approval of all attorneys, the judge decided to question Juror M in open court out of the presence of the other jurors. Juror M related that he knew the mother of government witness John King. He said her name was Plemeer, and that he worked with her at Benton Harbor and was in a Narcotics Anonymous program with her. He learned of her relationship with witness King when Plemeer heard that he was on jury duty and told him that John King was her son. Juror M then told Plemeer that he could not say anything else and ended the conversation. He told the court that she was "completely okay with everything" and was not trying to sway him. In response to the court's questions, Juror M affirmed that the information would not cause him any problems or reservations in the case either for or against the government or defendants, that he could put aside that knowledge as a juror, and that he could be a good, fair and impartial juror.

   The court consulted with the attorneys, at which time the government requested that the court question Juror M further about his participation in Narcotics Anonymous. The court then asked Juror M why he did not reveal his Narcotics Anonymous participation when queried about any organizations to which he belonged. Juror M replied that he

considered it a program, with meetings that are attended anonymously as needed, rather than an organization of which one was a member. In response to questions by the court, he declared that his history as a narcotics user would not cause him any bias or prejudice in the case. In light of those responses, the court declined to dismiss him for cause. Over the defendants' objections, the court nevertheless allowed the government to exercise one of its peremptory challenges "left over" from jury selection, based on the newly discovered information. Because Juror M was one of two African-Americans on the jury and the sole African-American male, the challenge impacted the racial composition of the jury, but the defendants did not raise a Batson challenge to the government's use of the peremptory.

This is a direct appeal and thus governed by Federal Rule of Criminal Procedure 52(a) ("Rule 52(a)"), which allows reversal only for errors that affect substantial rights. Neder v. United States, 527 U.S. 1, 7 (1999). Therefore, we must determine whether there was error here and, if so, whether that error affected the defendants' substantial rights.

II.

The government does not even concede that it was error for the court to allow it unilateral use of peremptory challenges mid-trial, much less error that affects substantial rights. Not surprisingly, the rule which delineates the federal right to peremptory challenges, Fed. R. Crim. P. 24, does not explicitly address the use of peremptory challenges mid-trial. But peremptory challenges by their very nature are a jury selection tool, and have historically and uniformly been limited to the pre-trial jury selection process. Moreover, the district court set forth the rules by which peremptory challenges could be used in this case, and those rules precluded the use of peremptory challenges once a potential juror passed the first round of challenges. Those procedures were not followed, with the result that only the prosecution had the opportunity to subsequently exercise peremptory challenges. Because peremptory challenges are a tool used in jury

selection that had never before been extended to the trial itself, the defendant had no reason to "save" peremptory challenges for use during trial. In fact, the ability to remove jurors with peremptory challenges mid-trial is a significant weapon. At that time, the parties have had the opportunity to observe the demeanor of the jurors and to employ that knowledge in their decision. It would fundamentally alter the peremptory challenge to allow its use in this manner.

Moreover, the alternate juror provisions indicate that peremptory challenges do not survive the jury selection process. First, Rule 24(c) allows the court to empanel no more than six alternate jurors. If the parties were allowed to "save" their peremptory challenges for use during the trial, however, that number of alternates would be woefully inadequate to ensure that a jury remained once the challenges were used. Rule 24(c) also provides that alternate jurors shall replace regular jurors who are "unable" or "disqualified" to perform their duties. In the present case, Juror M was neither unable to perform his duties, nor was he disqualified from performing them. He was instead a qualified, presumptively-impartial juror who was removed at the discretion of the prosecution without cause. Such a discretionary removal runs counter to the limitations set forth in Rule 24(c) for replacement of regular jurors with alternates. The court's decision to allow the prosecutor to remove an impartial juror mid-trial was therefore error.

The government's argument that the district court limited the mid-trial use of peremptory challenges to situationsinvolving new information does not alter that conclusion. If that new information impacted the juror's impartiality, the juror could be removed for cause. Absent that, however, the prosecutor does not have the discretion to remove a juror mid-trial. We note that the prosecution had the opportunity to submit questions at voir dire that would have revealed the "new" information, and chose not to do so. We have no desire to unleash fishing expeditions during trial designed to elicit "new information" concerning seated jurors deemed undesirable, nor do we wish to encourage

parties to refrain from submitting questions on voir dire in order to leave open avenues for challenges during trial. Peremptory challenges are a tool of jury selection as is evidenced by the consistent practice and the provisions for alternate jurors, and they have no place during the trial.

The allowance of peremptory challenges during the trial would be statutory error in any case, but presents constitutional problems as well where, as here, only one side is afforded that opportunity because the notice given to the defendants regarding the procedures for peremptory challenges was inadequate and misleading. The district court stated that peremptory challenges could not be used once a potential juror was passed, and that subsequent challenges would be limited to challenges for cause. The defendants were entitled to rely on that procedure in determining how to effectively employ their peremptory challenges, and did so here.

Although the defendants have no constitutional right to peremptory challenges, that does not end the constitutional inquiry. The Supreme Court addressed an analogous situation in Wardius v. Oregon, 412 U.S. 470 (1973), a case involving pre-trial discovery. The Court recognized that the defendant has no right to pre-trial discovery (the Brady rule being an exception to that), but the Court nevertheless found a due process violation where the defendant was required to provide alibi information pre-trial, but no corresponding pre-trial discovery obligation was imposed on the state. In so holding, the Court noted that "[a]lthough the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, . . . it does speak to the balance of forces between the accused and his accusers." Id. at 474. The Court held that it was fundamentally unfair to force the defendant to disclose information pre-trial, and not impose a similar requirement on the State. Id. at 476. Therefore, although the state need not adopt any pre-trial discovery provisions, if it did so, due process required that it be a "two-way street." Id. at 475.

Wardius makes clear, therefore, that it does not end the inquiry to state that

peremptory challenges are a creature of statute, and not constitutionally-required. When they are granted by statute, the question becomes whether it violates due process to allow only one party to exercise such a challenge mid-trial. Due process does not require absolute symmetry between rights granted to the prosecution and those afforded the defense. Our system is not one of symmetry at every stage, but of an overall balance designed to achieve the goal of a fair trial. See Tyson v. Trigg, 50 F.3d 436, 440 (7th Cir. 1995); United States v. Turkish, 623 F.2d 769, 774-75 (2d Cir. 1980); Katherine Goldwater, Limiting a Criminal Defendant's Use of Peremptory Challenges: On Symmetry and the Jury in a Criminal Trial, 102 Harv. L. Rev. 808, 820-26 (1989). Toward that end, different rights are granted to each side. Id. We have recognized, however, that "a shift at just one stage might so alter the total balance of advantages in favor of the prosecution as to deprive the defendant of the right to a fair trial." Tyson, 50 F.3d at 441. Therefore, although peremptory challenges are not constitutionally required, due process may be violated by a system of challenges that is skewed towards the prosecution if it destroys the balance needed for a fair trial.

The importance of the peremptory challenge device to the accused, and the history of peremptory challenges in this country, indicates that a system of peremptory challenges skewed toward the prosecution would impair the right to an impartial jury and a fair trial. The Supreme Court has long recognized that peremptory challenges are one of the most important of the rights secured to the accused, and that the system of peremptory challenge has traditionally provided the assurance of impartiality. Holland v. Illinois, 493 U.S. 474, 483 (1990). Peremptory challenges assure the selection of a qualified and unbiased jury by enabling each side to exclude those potential jurors believed to be most partial towards the other side, thus eliminating extremes of partiality on both sides. Id. at 484, citing Batson v. Kentucky, 476 U.S. 79, 91 (1986). As such, the device "occupies 'an important position in our trial procedures,' . . . and has indeed been considered 'a necessary part of trial by jury.'" Id.,

quoting Batson, 476 U.S. at 98, and Swain v. Alabama, 380 U.S. 202, 219 (1965) overruled by Batson. The Court further recognized that the goal of an impartial jury is obstructed by procedures that cripple the device of peremptory challenge. Id. at 483-84. Thus, the Court has repeatedly recognized the significance of the peremptory challenge to the defendant, and to the goal of an impartial jury.

Moreover, in this country, defendants have historically been allowed a greater or equal number of peremptory challenges than the prosecution, thus reflecting a "balance" that favors the defendant rather than the prosecution. See generally, J.E.B. v. Alabama, 511 U.S. 127, 146-51 (1994) (O'Connor, J. concurring); Swain, 380 U.S. at 214-16. The Court in analyzing the impartial jury requirement and peremptory challenges particularly, has long indicated that the relative rights of the prosecution and the accused must be at least equal. See Georgia v. McCollum, 505 U.S. 42, 47 n.4 (1992), Batson, 476 U.S. at 107 & 126 (Marshall, J. concurring and Burger, J. dissenting), and Swain, 380 U.S. at 220, (all noting, in the context of peremptory challenges, that between the defendant and the state, "the scales are to be evenly held"); see also Holland, 493 U.S. at 481 (in analyzing the fair-cross-section requirement, stating that the Sixth Amendment guarantee of an impartial jury requires that the prosecution and defense compete on equal basis); but cf. Tyson, 50 F.3d at 440-41 (musing that allowing only the prosecution to exercise peremptory challenges might be defended as appropriate to offset the advantage to defendant of the high burden of proof). Peremptory challenges are a significant means of achieving an impartial jury, and as between the defendant and the prosecution, the "balance" struck to achieve an impartial jury and a fair trial is one of at least equivalent rights, and arguably weighs in favor of the defendant. In addition, that balance serves an important function in maintaining the appearance, as well as the reality, of justice. Swain, 380 U.S. at 219; Georgia, 505 U.S. at 57. Therefore, a shift in the balance of peremptory challenges favoring the prosecution over the defendant can raise due process concerns.

Here, we are presented with such a shift. The prosecution was unilaterally granted control over the composition of the jury during the trial stage. Moreover, the lack of notice effectively precluded the defendants from intelligently exercising their peremptory challenge rights. That skewed the jury selection process in favor of the prosecution, and adversely impacted the ability of the peremptory challenge process to fulfill its function as a means of ensuring an impartial jury and a fair trial. Accordingly, the defendants' due process rights were violated by a jury selection process that failed to minimally inform them of the procedures that ultimately were followed, and by the decision to allow the government to unilaterally alter the composition of the jury mid-trial. See generally Ross v. Oklahoma, 487 U.S. 81 (1988) and United States v. Martinez-Salazar, 528 U.S. 304 (2000) (discussing due process implications of errors regarding peremptory challenges).

III.

We turn, then, to the question of whether the error in this case affected the defendants' substantial rights. The caselaw is still evolving both in defining what types of errors impact "substantial rights" generally, and in determining the extent to which errors regarding peremptory challenges fit that definition.

A.

Rule 52(a) applies to errors at trial which were brought to the attention of the trial court, and provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Because peremptory challenges have been described as "one of the most important of the rights secured to the accused," it would seem a natural conclusion that the due process violation in this case regarding peremptory challenges would "affect substantial rights," requiring reversal. As is often true, however, the words "affect substantial rights" have taken on a life of their own, and require a more elaborate analysis.

The requirement that an error "affect substantial rights" generally means that the error must have been prejudicial in that it must have affected the outcome of the district court proceedings. United States v. Olano, 507 U.S. 725, 734 (1993). For errors falling within Rule 52(a), the government bears the burden of persuasion with respect to prejudice. Id. at 734-35. Courts normally engage in the harmless-error inquiry to determine whether an error was prejudicial and thus affected substantial rights. Id.

The Supreme Court has long recognized, however, that some basic trial rights can never be treated as harmless error. See Brecht v. Abrahamson, 507 U.S. 619, 629 (1993); Arizona v. Fulminante, 499 U.S. 279, 309 (1991); Gomez v. United States, 490 U.S. 858, 876 (1989). Errors that require automatic reversal include structural defects affecting the framework in which the trial proceeds, as opposed to errors in the trial process itself. Neder, 527 U.S. at 8-9; Arizona, 499 U.S. at 309. Those structural errors implicate basic protections, and render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. Id. It is a categorical determination rather than a case-specific one. Neder, 527 U.S. at 14. In Olano, the Court left open the question of whether structural errors not subject to the harmless error analysis fall within the Rule 52(a) requirement of "affecting substantial rights." Olano, 507 U.S. at 735 (raising but not deciding whether requirement that an error affect substantial rights was synonymous with prejudicial, or whether some errors falling under Rule 52(a) should be presumed prejudicial or could be corrected regardless of their impact on the outcome); see also United States v. Underwood, 130 F.3d 1225, 1228 (7th Cir. 1997) (dissenting from denial of reh. en banc) (distinction between trial and structural errors relevant only under state cases, and inappropriate under Rule 52(a)).

That question was resolved in Neder, which applied the structural error analysis to the Rule 52(a) context. The Neder Court recognized

a limited class of fundamental constitutional errors that "defy analysis

by 'harmless error' standards."
[citations omitted] Errors of this type
are so intrinsically harmful as to
require automatic reversal (i.e., 'affect
substantial rights') without regard to
their effect on the outcome. For all
other constitutional errors, reviewing
courts must apply Rule 52(a)'s harmless-
error analysis and must "disregar[d]"
errors that are harmless "beyond a
reasonable doubt."

527 U.S. at 7. Thus, the Neder Court
clarified that Rule 52(a) requires
reversal of errors that are not harmless
beyond a reasonable doubt or that fall
within that class of fundamental
constitutional rights that require
automatic reversal without regard to
harmlessness.

The subset of errors that mandate
automatic reversal is a small one. It
includes errors such as the complete
denial of counsel, a biased judge, racial
discrimination in the selection of the
grand jury, the denial of self-
representation, the denial of a public
trial, and a defective reasonable doubt
instruction. See, respectively, Gideon v.
Wainwright, 372 U.S. 335 (1963); Tumey v.
Ohio, 273 U.S. 510 (1927); Vasquez v.
Hillery, 474 U.S. 254 (1986); McKaskle v.
Wiggins, 465 U.S. 168 (1984); Waller v.
Georgia, 467 U.S. 39 (1984); and Sullivan
v. Louisiana, 508 U.S. 275 (1993). In
contrast, errors such as the omission of
an element of an offense do not
necessarily defy harmless error review or
affect the framework within which the
trial proceeds, and are not grounds for
automatic reversal. See Neder, 527 U.S.
at 7-14.

All of these cases, however, are part of
a cohesive whole-- a "spectrum"of
constitutional errors. Brecht, 507 U.S.
at 629. The ultimate determination is
always whether a substantial right was
implicated. The procedures and
constitutional protections afforded
defendants operate to provide a fair
process for adjudicating the defendants'
guilt or innocence, but also to ensure
that society perceives the process to be
fair, thus promoting respect for the rule
of law. The errors impacting "structural"
rights require automatic reversal because
they impact the very foundation of a fair
trial. The rule of automatic reversal is

thus essentially a categorical application of the harmless error standard. Errors such as complete denial of counsel, a biased judge, the denial of self-representation, etc., "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for the determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair,'" Neder, 527 U.S. at 8-9 [citation omitted], thus necessarily adversely impacting the dual interests identified above. See United States v. Santos, 201 F.3d 953, 959-60 (7th Cir. 2000) (structural errors are reversible per se "because the error either is serious yet its effect on the outcome of a particular case difficult to establish (an example is the denial of the right to a jury trial) or infringes a right unrelated or only distantly related to the interest in making sure (so far as possible) that innocent people aren't convicted; allowing racially motivated peremptory challenges of prospective jurors is an example.") (citations omitted). Therefore, those errors are conclusively presumed to be prejudicial.

At the other end of the spectrum are typical "trial" errors, which do not call into question the framework in which the defendant is judged, and thus do not by their very nature prejudice the rights of the defendant and society as a whole to a fair system of adjudication. "If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutiona[l] errors that may have occurred are subject to harmless-error analysis." Neder, 527 U.S. at 8, quoting Rose v. Clark, 478 U.S. 570, 579 (1986). Trial errors generally occur during the presentation of the case to the jury, and are amenable to harmless error analysis because they may be quantitatively assessed in the context of the evidence as a whole, to determine the effect on the trial. Brecht, 507 U.S. at 629. No presumption of prejudice attaches for such errors, and they do not require reversal if they are harmless beyond a reasonable doubt. Neder, 527 U.S. at 8.

Not every error, however, is easily shoe-horned into one of those neat categories. The "nature, context, and significance of the violation," for

instance, may determine whether automatic reversal or the harmless error analysis is appropriate. United States v. Pearson, 203 F.3d 1243, 1261 (10th Cir. 2000); Yarborough v. Keane, 101 F.3d 894, 897 (2d Cir. 1996). This is apparent in the right to counsel cases, in which the total deprivation of the right to counsel is considered structural error whereas the denial of the right to counsel at a preliminary hearing is subject to harmless error review. Id. Similarly, the exclusion of a defendant from the trial constitutes structural error, but the defendant's absence from a discrete part of the trial process may not. Id.

And some errors may fall in the middle ground between those two categories of structural and trial errors. Thus, arguably next on the spectrum, after structural errors conclusively presumed prejudicial, are errors such as jury tampering which are deemed presumptively prejudicial by their very nature. See Remmer v. United States, 347 U.S. 227, 229 (1954) (jury tampering presumptively prejudi- cial); Olano, 507 U.S. at 735 & 739 (recognizing that there may be errors that should be presumed prejudicial). Where improper contact is made with a juror during a trial, the potential for prejudice to the defendant is signif- icant but would be very difficult for the defendant to prove. Accordingly, regardless of whether the government was aware of the juror contact, the contact is deemed presumptively, although not conclusively, prejudicial, and the government bears the heavy burden of establishing after a hearing that the contact with the juror was harmless. Remmer, 347 U.S. at 229. The presumption of prejudice renders that type of error different in nature from other trial errors, to which no such presumption attaches.

The Supreme Court, which used the "spectrum" language, has recognized the possibility of other errors that do not fall neatly into the structural or trial categories. In footnote nine of Brecht, the Court declared that "[o]ur holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the

proceedings as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict."/2 507 U.S. at 638, n.9. Even some "trial" errors, then, may require automatic reversal. See Hassine v. Zimmerman, 160 F.3d 941, 959-61 (3rd Cir. 1998), Hardnett v. Marshall, 25 F.3d 875, 879-80 (9th Cir. 1994), and Cupit v. Whitley, 28 F.3d 532, 538 (5th Cir. 1994), applying "footnote nine exception."

   Thus, there are many different paths in determining whether an error prejudiced a defendant so as to affect substantial rights. Not surprisingly, deciding which standard applies to a particular error is a daunting task. Here, we must determine where on that spectrum the constitutional error in this case falls.

B.

   The error presented here is precisely the type of error that "defies harmless error analysis." No one argues that the alternate who replaced Juror M was somehow biased, and it is impossible to determine what impact, if any, the substitution had on the jury's ultimate decision. This would be true of many errors relating to peremptory challenges, because the existence of challenges for cause presumably removes anyone with obvious bias or potential for bias, and we cannot assess how the makeup of the jury may have impacted the decision-making process.  If the inability to ade quately assess harmlessness were the only consideration, then we could immediately conclude that automatic reversal is appropriate for all errors involving peremptory challenges. The Supreme Court at one time appeared to endorse that view, stating in Swain that peremptory challenges are one of the most important of the rights secured to the accused, and that the "denial or impairment of the right is reversible error without a showing of prejudice." 380 U.S. at 219. The Court reiterated that sentiment in Ross v. Oklahoma, 487 U.S. 81, 89 (1988), quoting that same language from Swain, and we employed that reasoning in United States v. Underwood, 122 F.3d 389 (7th Cir. 1997). In Underwood, the defendant complained of a jury process that was so confusing as to impair his right to the intelligent use of his peremptory

challenges. Id. at 391-92. The jury selection process effectively misled Underwood regarding how potential jurors would be seated on the final jury, with the result that he opted not to challenge two potential jurors based on his mistaken belief that they were too far down on the list to make it onto the petit jury. Id. at 395. Those two jurors, however, were among the first twelve on the judge's list, and sat as jurors at the trial. Id. Relying in part on Swain, we held that the process impaired the intelligent exercise of his peremptory challenges in violation of the Fifth Amendment, and thus required automatic reversal. Id. at 392.

More recently, however, the Supreme Court in Martinez-Salazar, 528 U.S. at 317 n.4, appeared to back away from that view, noting that "the oft-quoted language in Swain was not only unnecessary to the decision in that case . . . but was founded on a series of our earlier cases decided long before the adoption of harmless-error review." Id. at 782 n.4. The Martinez-Salazar Court, however, did not decide the appropriate remedy for such a violation, because it found no impairment of the right to the peremptory challenge in the defendant's use of a peremptory challenge to correct the trial court's erroneous denial of a challenge for cause.

We then picked up the mantle in United States v. Patterson, 215 F.3d 776 (7th Cir. 2000), vacated in part by Patterson v. United States, 121 S. Ct. 621 (2000). Freed from the Swain language by the Court's footnote in Martinez-Salazar, we held that the loss of a peremptory challenge does not require automatic reversal. In Patterson, the defendant had asserted a number of errors related to peremptory challenges. Among them was an error relating to alternate jurors, which had the effect of diminishing the number of challenges provided by statute. Rule 24(c)(2) grants 3 extra peremptory challenges for 6 alternates, and the district court had granted only 2 challenges for 8 alternates. Id. at 780. Although that was a technical violation of the rule, we noted that this jury selection process had not followed the typical process. Id. Rule 24(c)(2) assumes jurors will be selected either by the jury-box system or the struck-jury

method, in which the defendants know the sequence in which members of the pool will be seated and use their peremptory challenges with this knowledge. Accordingly, it provides extra peremptory challenges for the selection of alternates because otherwise defendants might have no challenges when those jurors are examined. Id. In Patterson, however, the defendants were unaware of which jurors would be seated first, and used their peremptory challenges on the group as a whole. Id. We stated that "[b]ecause the peremptory challenges exercised against the pool of 63 were as likely to excuse would-be alternates as to excuse would-be regular jurors, there was no need for a second allotment of challenges." Id. Nevertheless, Rule 24 (c)(2) provided for such challenges, and thus the rule was violated by the failure to provide all the required challenges. We held that such a violation of the rule did not require automatic reversal. Id. at 781-82.

We first rejected the notion that such a loss of a peremptory challenge is per se a violation of a substantial right. Id. at 781. Where the seated jury was impartial, we refused to group such an error with those such as a biased tribunal or total deprivation of counsel which require automatic reversal. Id. at 781-82. In so holding, we relied on McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984), in which the Court applied the harmless error test where a juror failed to respond to a question on voir dire, thereby depriving the defendant of information useful in exercising the peremptory challenge. The Court in that case declared that reversal was justified only if a correct response by the juror would have provided the basis for a challenge for cause. Id. at 556. Although information is important in an intelligent exercise of peremptory challenges, the Court held that the "harmless error rules adopted by the Court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." Id. at 553, quoted in Patterson, 215 F.3d at 782.

Following the reasoning in McDonough, this court in Patterson held that

automatic reversal was improper for the Rule 24(c)(2) violation presented in that case. The court recognized, however, that the possibility remained that in another case, an error in peremptory challenges might affect a right that is substantial, in the sense that it has a substantial and injurious effect or influence in determining the jury's verdict. 215 F.3d at 782, citing Kotteakas v. United States, 328 U.S. 750 (1946). The court further opined that "[a]n exceptionally confused jury-selection process may have such an effect," and thus that the result in Underwood was not necessarily wrong. 215 F.3d at 782.

Today, we are presented with a case presenting just that scenario. We have here a jury-selection process that was not only exceptionally confused, and thus analogous to Underwood, but which was completely subverted with the extension of peremptory challenges to the trial itself. In this case, the court set forth the rules of jury selection, and then without notice disregarded them, thus preventing the defendants from intelligently exercising their peremptory challenges and yielding exclusive control over the jury to the prosecution at the trial stage. That procedure crippled the device of peremptory challenges, thus obstructing the goal of an impartial jury. See Holland, 493 U.S. at 483-84.

This is different from the cases discussed above, in which the rules used by the court prevented the defendants from maximizing the strategic use of their peremptory challenges. Here, the error was serious enough to effect a shift in the total balance of advantages in favor of the prosecution, which we recognized in Tyson could deprive defendants of a fair trial. 50 F.3d at 441. The prosecution was unilaterally permitted to use a pre-trial jury selection tool to alter the composition of the jury mid-trial by removing an unbiased juror (we must presume that he is unbiased, because the district court denied the challenge for cause and no one contests that decision, which is clearly supported on the record.) The government used that peremptory challenge, presumably for the purpose of obtaining a jury more favorable to the prosecution, on the sixth day of an eight-day trial, at which point it would have had signifi

cant opportunity to observe the demeanor of the juror, and to assess whether the alternate juror would be more favorable to its case. This is the type of error that affects the essential fairness of the trial and calls into question the impartiality of the jury, in contrast to the errors addressed in cases such as Patterson and McDonough.

At a minimum, defendants are entitled to a jury process that does not provide the prosecutor with a tool for eliminating jurors that is denied to the defendants. And although the defendants did not seek to exercise any peremptory challenges mid-trial because they did not possess any, they were denied that right just as surely because they were never even informed that peremptory challenges could survive the pre-trial stage and be utilized at trial. Such an error affects the fundamental fairness of the trial, both because it failed to provide notice to the defendants of the jury selection process that would actually be used (and in fact had the effect of affirmatively misleading them), and because it gave the prosecutor unilateral, discretionary con trol over the composition of the jury mid-trial.

That error is the type of fundamental error requiring automatic reversal. The critical problem here is that one party was allowed exclusive, discretionary control over the composition of the jury mid-trial, and whether the mechanism for achieving that control was a peremptory challenge or another device is unimportant. The error is a "structural defect affecting the framework within which the trial proceeds." For instance, in Brecht v. Abrahamson, 507 U.S. 619 (1993), the Court clarified that trial error occurs "'during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of the other evidence presented in order to determine [the effect it had on the trial].'" 507 U.S. at 629, quoting Arizona, 499 U.S. at 307-08. In contrast, structural defects in the constitution of the trial mechanism defy such analysis, and require automatic reversal because they infect the entire trial process. Brecht, 507 U.S. at 629. Here, the framework in which the trial proceeded was fundamentally altered, with the jury

selection mechanism transported to the trial stage for one party. Moreover, whether using the Kotteakas standard set forth in Patterson for non-constitutional peremptory challenge error (substantial and injurious effect), or the Chapman harmless error standard for constitutional errors, it is simply impossible as a practical matter to assess the impact on the jury of such an error. In the end, we would instead be presuming prejudice or lack thereof based on the seriousness of the error and the extent to which it compromised the jury process. Where the error is severe enough to call into question the proper functioning of the jury selection process, the impartiality of the jury could no longer be presumed. That would require reversal regardless of whether the means of achieving it was a peremptory challenge or another device.

But even viewing the error strictly in light of precedent addressing peremptory challenges, automatic reversal is required. The Supreme Court has stated that "[i]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutiona[l] errors that my have occurred are subject to harmless-error analysis." Neder, 527 U.S. at 8, quoting Rose, 478 U.S. at 579. Here, however, the error calls into question the impartiality of the jury because it cripples the device designed to ensure an impartial jury by giving each party an opportunity to weed out the extremes of partiality. Therefore, the presumption is inapplicable. The right to an impartial jury is the sort of right that requires automatic reversal when denied. As with other such errors, however, the "nature, context, and significance" of a violation may determine whether automatic reversal or harmless error analysis is appropriate. Minor or technical errors that do not significantly undermine the constitutional right do not require automatic reversal. See Pearson, 203 F.3d at 1261 & Yarborough, 101 F.3d at 897 and cases discussed therein. Where the error is substantial enough to undermine the constitutional right, however, automatic reversal is required. We have such an error here. Unlike Patterson, this is neither an insignificant nor a technical error. See United States v. Polichemi, 219 F.3d 698, 705 (7th Cir. 2000)

(distinguishing Patterson, in which the error did not call into question the impartiality of the jury ultimately selected, from Underwood, where the entire process of jury selection was infected with ambiguity). The error here adversely impacted the ability of the peremptory challenge device to fulfill its purpose of ensuring an impartial jury, and therefore reversal is necessary without engaging in a harmless error inquiry.

Any other holding would effectively eliminate the ability of defendants to appeal any restrictions on peremptory challenges, thus frustrating the peremptory challenge device as a means of ensuring an impartial jury. Some examples may illustrate the problem. Consider the scenario in which the district court rules that the defendants must use their peremptory challenges pre-trial, but that the government could use them at any point in time before the jury retired to deliberate. Or, the situation in which the court determines that only the government, and not the defendant, will be allowed the use of peremptory challenges. But cf. Tyson, 50 F.3d at 440-41. Both examples may seem far-fetched, but so did the use of a peremptory challenge mid-trial before this case. In each instance, the framework in which the trial proceeds is fundamentally altered, with an effect that is difficult to establish. Are we to say that reversal is inappropriate in those instances because the jury that actually sat was impartial, based on the fiction that the challenges for cause eliminated all biased jurors and that peremptory challenges are a statutory creation not constitutionally-required? Although they are not constitutionally-required, the Supreme Court has long recognized that the right of peremptory challenges is one of the most important of the rights secured to the accused. They are a tool for achieving the constitutional mandate of an impartial jury, by allowing each party to eliminate those jurors with real or suspected biases. See Ross, 487 U.S. at 88. Although challenges for cause eliminate presumptively biased jurors, peremptory challenges weed out the extremes of partiality on both sides. Holland, 493 U.S. at 484. Thus, a system that grants the right to only one party threatens

that goal of an impartial jury by skewing the jury towards the favored party. This is different from an error that impedes the ability of a defendant to maximize the strategic use of his peremptory challenges, or that affects the number of peremptory challenges available in a technical sense. Here, both parties were given discretionary control over the jury composition at the pre-trial stage, and then one party exclusively was given that control during the subsequent stage of the trial itself. That is conceptually indistinguishable from the example above in which only the government is allowed to use peremptory challenges. We cannot tolerate a system in which control over the jury rests in the exclusive domain of one party during a particular stage of the proceedings. That is a structural error that requires automatic reversal.

IV.

Because we are reversing on the peremptory challenge issue, we need not address the challenge to the court's admission of evidence regarding a murder. On remand, the court will again weigh the prejudice and probative value of such evidence. If the court again finds that the balance weighs in favor of admission, we trust that the court will limit the details of the murder to those relevant to the probative value, so as to minimize the prejudice.

For the above reasons, we vacate the convictions of each defendant-appellant and remand for a new trial.

FOOTNOTES

/1 To protect the juror's privacy, we will refer to him only as Juror M.

/2 The Court then cited to Justice Stevens' concurrence in Greer v. Miller, 483 U.S. 756, 769 (1987). Justice Stevens in that concurrence recognized four types of constitutional errors: "The one most frequently encountered is a claim that attaches a constitutional label to a set of facts that does not disclose a violation of any constitutional right. . . . The second class includes constitutional violations that are not of sufficient import in a particular case to justify reversal even on direct appeal, when the evidence is still fresh and a fair retrial could be promptly conducted. . . . A third category includes errors that are important enough to

require reversal on direct appeal but do not reveal the kind of fundamental unfairness to the accused that will support a collateral attack on a final judgment. . . . The fourth category includes those errors that are so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained." [citations omitted] Id.