**Uniko CARSON, Plaintiff,**

v.

**Brian FISCHER, Superintendent, Sing Sing Correctional Facility and Elliot Spitzer, New York State Attorney General, Defendants.**

No. 03–CV–4746(ERK)(SC).

United States District Court,
E.D. New York.

May 13, 2004.

As Amended June 1, 2004.

Amy Irene Donner, The Legal Aid Society, New York City, for Petitioner.

Traci R. Wilkerson, Office of the District Attorney, Queens County, Kew Gardens, NY, for Respondents.

### *MEMORANDUM & ORDER*

KORMAN, Chief Judge.

Petitioner Uniko Carson seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 from his 1999 conviction for criminal sale of a controlled substance in the first degree. After a jury trial, petitioner was sentenced to a term of imprisonment of 15 years to life. The Appellate Division affirmed the conviction, *People v. Carson*, 292 A.D.2d 461, 740 N.Y.S.2d 346 (2d Dep't 2002), and petitioner's application for leave to appeal to the Court of Appeals was

denied. *People v. Carson*, 98 N.Y.2d 673, 746 N.Y.S.2d 462, 774 N.E.2d 227 (2002).

Briefly, petitioner does not seek habeas corpus relief because he was wrongly convicted. He seeks relief because his ex-mother-in-law was excluded from the courtroom during the testimony of one of two witnesses who identified petitioner as having sold cocaine—testimony for which the jury, petitioner, petitioner's attorney, and petitioner's family remained in the courtroom. Petitioner claims that at the very least, the trial judge should have also allowed his ex-mother-in-law to remain in the courtroom while hiding the witness behind a curtain or placing the witness in a disguise. In the words of Judge Friendly, "[t]he proverbial man from Mars would surely think we must consider our system of criminal justice terribly bad if we are willing to tolerate such efforts at undoing judgments of conviction." Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L.Rev. 142, 145 (1970–1971). Because any violation of petitioner's rights was harmless and habeas relief would be vastly disproportionate to any violation of petitioner's rights, the petition is denied.

### Background

In 1997, petitioner was indicted, along with co-defendant Leroy Williams, Troy Muldrow, and Eric Graham for one count of conspiring to sell a controlled substance and two counts of criminal sale of a controlled substance in furtherance of the conspiracy. The case against petitioner grew out of a long-running investigation of a large narcotics operation in the Lefrak City area of Queens. In late 1995, the police arrested a drug dealer named Larry Sanchez. Mr. Sanchez then agreed to assist the police by arranging drug sales between various individuals (including petitioner, Mr. Williams, Mr. Muldrow, and Mr. Graham) and an undercover detective in exchange for a reduced sentence. Peti-

tioner became involved when Mr. Sanchez told petitioner that he knew somebody coming in from out of town who was seeking to buy drugs. Sanchez arranged a specific time and location for a "buy and bust," and then contacted the police.

On September 17, 1996, undercover detective Frank Patinella arrived at the predetermined location in Queens and awaited Sanchez's and petitioner's arrival. Eventually, a livery cab pulled up in front of him, Sanchez opened the door, and Patinella entered. Petitioner sat on one side of the cab, detective Patinella sat on the other side, and Sanchez sat in the middle. Detective Patinella told petitioner what he wanted and petitioner gave him a brown paper bag. After looking inside the bag, Patinella handed petitioner $2,200 in prerecorded buy money and exited the vehicle. Patinella later confirmed that the bag contained two and one quarter ounces of cocaine, and on March 28, 1997, he identified petitioner in a line-up conducted at the 114th precinct as the individual who had sold him cocaine on September 17, 1996. Similar "buy and bust" sales took place with co-defendant Williams and Graham and Muldrow, the two other individuals with whom petitioner was indicted. In early 1999, petitioner was tried along with co-defendant Williams.

At trial, the prosecution's primary evidence was the testimony of Detective Patinella and Mr. Sanchez, who testified to each of the "buy and bust" transactions they had arranged with the individuals indicted, including petitioner. Petitioner took the stand in his own defense and denied that he ever sold drugs. Indeed, he claimed to specifically remember September 17, 1999 because he had the day before registered for a six-week course to obtain his General Equivalency Diploma. Petitioner also explained that while he was not involved in the Lefrak City drug trade,

he was aware of Mr. Sanchez's role in it, having seen him selling drugs· on several occasions.

At the conclusion of the testimony, the trial judge dismissed the conspiracy count against both petitioner and his co-defendant and charged the jury as to the criminal sale counts. The jury ultimately convicted petitioner and his co-defendant of the criminal sale counts, and the trial judge sentenced petitioner to a term of imprisonment of 15 years to life, the minimum term for which he was eligible.

### Discussion

 Petitioner does not contend that his conviction should be overturned because it was erroneous or. because of a trial error that affected the outcome. To the contrary, petitioner seeks habeas relief on the sole ground that his ex-mother-in-law was asked to leave the courtroom during the testimony of Larry Sanchez. At the outset, it is important to recognize the public policies surrounding petitioner's claim. The public and the press have a right of access to courtroom proceedings, civil or criminal, that is protected by the First Amendment. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 580, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (finding that the "right to attend criminal trials is implicit in the guarantees of the First Amendment," and that "without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and of the press could be eviscerated"); *see also ABC, Inc. v. Stewart,* 360 F.3d 90, 98–99 (2d Cir.2004). Moreover, a public and media presence in the courtroom operates to apprise the public of the manner in which judicial proceedings are conducted, and hopefully to increase public confidence in the judicial process. *See In re Oliver,* 333 U.S. 257, 270 n. 24, 68 S.Ct. 499, 92 L.Ed. 682 (1948). But these considerations are separate from the considerations underlying the Sixth Amendment, which guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial." U.S. Const. amend. VI. As the Second Circuit has recently explained, the public trial right that an "accused shall enjoy" is contoured to match its purpose. *See generally Brown v. Kuhlmann,* 142 F.3d 529, 534–37 (2d Cir.1998). A public presence ensures that the participants in a criminal proceeding act honestly and fairly, and the public trial right is thus is one of the significant rights preventing those proceedings from becoming instruments of persecution. This goal is not implicated in every courtroom closure case.

The Supreme Court has not often considered the criminal defendant's right to insist on a public trial, but when it has, the goal underlying the right has been squarely at issue. In *In re Oliver,* the Supreme Court considered a case where an accused was "tried, convicted, and sent to jail, when everybody else [was] denied entrance to the court except the judge and attaches." 333 U.S. at 271, 68 S.Ct. 499. Pursuant to a Michigan law then in force, a judge had conducted a secret "one-man grand jury" investigation that turned into an adversarial contempt proceeding when he disbelieved the accused's testimony. The judge convicted the accused of contempt without ever opening the proceeding to a jury or the public, or allowing the accused to confront those whose testimony led the judge to disbelieve him. The Supreme Court vacated the conviction because, "[w]hatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." *Id.* at 270, 68 S.Ct. 499. Some thirty-five years later, in *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the Supreme

Court dealt with a less egregious courtroom closure, but one that again involved complete closure of a significant and discrete part of the criminal proceeding. The trial court had closed a seven day suppression hearing to everyone but the parties, their attorneys, court personnel, and witnesses because the prosecution planned to play two and a half hours of tapes from wiretaps that it claimed could involve private matters. No hearing transcript was made available to the public until after the petitioner's trial. *Waller,* 467 U.S. at 43, 104 S.Ct. 2210. The Supreme Court found that this sweeping closure, which left the public in the dark until after petitioner's trial, "plainly was unjustified" and remanded for a new suppression hearing. *Id.* at 48, 104 S.Ct. 2210. In both *Oliver* and *Waller,* there was total closure of the courtroom. Such closures, if tolerated, would have the "the corrosive effect that a system of secret trials has on the fair administration of justice." *Brown v. Kuhlmann,* 142 F.3d at 536.

■ In this case, where the only "closure" at issue is the exclusion of petitioner's ex-mother-in-law from one witness's testimony, the central purpose of the public trial right is not implicated. The brief exclusion, while allowing petitioner, his attorney, and his family to remain in court for the duration of Mr. Sanchez's testimony, did not turn the trial into an "instrument of persecution." *In re Oliver,* 333 U.S. at 270, 68 S.Ct. 499. This is particularly true because, unlike in the courtroom closures discussed in *Oliver* and *Waller,* a jury of fourteen members of the community (twelve jurors and two alternates) was also present throughout Mr. Sanchez's testimony. The jurors, along with other members of petitioner's family, insured a public presence notwithstanding the exclusion of petitioner's ex-mother-in-law. *See Brown v. Kuhlmann,* 142 F.3d at 536 (citing Max Radin, *The Right to a*

*Public Trial,* 6 Temple L.Q. 381, 388 (1932)). Indeed, notwithstanding the energy the Second Circuit has expended on cases involving the limited closure of a courtroom during the testimony of a single witness in a jury trial, it is arguable whether such closures constitute a violation of the Public Trial Clause. Certainly, there is no Supreme Court case that so holds. And in at least one case, although with admittedly unusual circumstances, the Second Circuit held that such a limited closure was not a violation. *See Peterson v. Williams,* 85 F.3d 39 (2d Cir.) (holding that a brief and inadvertent continuation of a proper courtroom closure, not noticed by any participants in a jury trial, did not rise to the level of a violation of the Public Trial Clause), *cert. denied,* 519 U.S. 878, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996).

■ With this as a backdrop, I now turn to the specifics of petitioner's claim. The Supreme Court has drawn the following doctrinal line regarding a criminal defendant's right to a public trial:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure was properly entered.

*Waller v. Georgia,* 467 U.S. 39, 43, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (citations omitted). This statement has become a familiar four-factor test: "(i) the party seeking to close a portion of a criminal trial must advance an overriding interest that is likely to be prejudiced by an open courtroom; (ii) the closure must be no broader than necessary to protect that interest; (iii) the trial court must consider reasonable alternatives to closing the pro-

ceeding; and (iv) the trial court must make findings adequate to support the closure." *Brown v. Kuhlmann,* 142 F.3d at 537.

The prosecution, recognizing the framework set up by the Supreme Court in *Waller,* sought to close the courtroom during the testimony of informant Larry Sanchez pursuant to *People v. Hinton,* 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (1972). It argued that Mr. Sanchez had faced many threats regarding his cooperation and that because numerous interested people from the community had attended the trial, it would be prudent to close the courtroom during his testimony. Petitioner's trial counsel objected, principally on the grounds that because Mr. Sanchez's name and the existence of his cooperation had already been made public, there was no additional threat to his testifying in an open courtroom. The trial judge decided to hold a *Hinton* hearing before ruling on the matter.

At the hearing, Mr. Sanchez testified that he had agreed to cooperate with the Queens District Attorney's office a month after being arrested for the sale of narcotics. For approximately six months between August 1996 and March 1997, Mr. Sanchez's cooperation led to numerous arrests, including that of the petitioner. After his cooperation had concluded, Mr. Sanchez left Lefrak City for good. Notwithstanding the move, Mr. Sanchez's family and his girlfriend's family began receiving threats to the effect that, if Mr. Sanchez testified at trial, they would be killed. *See* A.65–69. The mothers of his two daughters were similarly threatened. *Id.* at 67–69, 334 N.Y.S.2d 885, 286 N.E.2d 265.

Mr. Sanchez also testified that he himself was threatened. Two months after his cooperation concluded, he was assaulted by individuals he recognized as drug dealers from Lefrak City. They told Sanchez that they were attacking him because "snitched on LeFrak" and that "if he wasn't [going to be] able to get to court to testify, it would help their cases." A.93. Mr. Sanchez further alleged that some seven months after his assault, and still a year before his testimony, he was accosted on a Metro–North train and told to "die" by someone he recognized from Lefrak City. *See* A.72–73. In total, he claimed to have experienced five to ten threatening incidents while in the Bronx, all involving people apparently connected with drug activities in Lefrak City. A.74, 89–90, 97. The most recent incident was less than two months before Mr. Sanchez's testimony. A.87–88.

Prior to his testimony, Mr. Sanchez had not approached the District Attorney to seek protection for himself or his family. Nevertheless, he feared that if he testified in open court, his family would be placed in increased danger because "the main threat" was that if he actually went ahead and testified, his family would be injured. A.76, 82. He feared that a spectator would return to Lefrak and report what had happened, leading someone to attack his family. He also stated that if the courtroom were left open, he would "be more nervous," explaining, "[i]t's hard enough for me to remember the issues as it is. [Testifying in an open courtroom] would make it more difficult for me to remember." A.78.

Petitioner's trial counsel responded to the prosecution's request to close the courtroom with the following: "We know who he is, everybody knows who he is, everybody [who] would be in the courtroom knows who he is . . . the People have not made a showing of any particularized danger from particular people so particular [conclusions] can be made, because an overbroad exclusion of people from the courtroom is also not allowed." A.108. Co-defendants' trial counsel, for his part, not-

ed his skepticism regarding Mr. Sanchez's fears because Mr. Sanchez had never approached the District Attorney to seek protection or identified individuals he specifically feared. A.41.

The trial judge decided to take a measured approach to the prosecution's request and close the courtroom to the public generally during Mr. Sanchez's testimony while allowing defendants' family members to remain inside. The judge explained that, "after hearing the witness, there is no doubt in my mind that he is terrified and there is no doubt in my mind that his fears are not generalized fears but very, very, specific, so specific that he says that one of the people [who] allegedly abused him was someone that he had seen with defendant Williams." A.115. He also explained that because Mr. Sanchez had not been in Lefrak City for some time, testifying in open court could allow many individuals to see him for the first time and "vastly increase the pool of people who would potentially be able to identify him and point him out to people in a public place and expose him to the potentiality of real danger, and that would apply to his loved ones, children, et cetera." A.116. This was of particular importance, according to the judge, because the courtroom "was packed" with "a larger attendance than any narcotics trial [the judge had] ever presided over." A.115–116.

Defense counsel urged the trial judge to instead leave the courtroom open while placing Mr. Sanchez behind a curtain or in a disguise, claiming that these were reasonable alternatives the judge had to consider pursuant to *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210. In fact, these are alternatives that the Second Circuit has cautioned could themselves "pose substantial risks to a fair trial for the defendant," and which it has specifically concluded *Waller* does not require a trial judge to

consider. *Ayala v. Speckard*, 131 F.3d 62, 71–72 (2d Cir.1997). The trial judge here sensibly declined the proposed alternatives and proceeded to identify who among the spectators were related to the defendants, and thus who would be permitted to remain in court for Mr. Sanchez's testimony. The trial judge admitted petitioner's brother, son, mother, and fiancee. *See* A.125–32. But when petitioner's ex-mother-in-law approached, the following discussion ensued:

> The Court: . . . Yes, ma'am?
>
> Spectator: Delores Broome, I'm Uniko Carson's mother-in-law.
>
> The Court: You say you're his mother-in-law? Your daughter—
>
> Spectator: Was his wife. [Referring to petitioner's son], [t]hat's my grandson.
>
> The Court: Your daughter is his legal wife?
>
> Spectator: Yes, and that's my grandson.
>
> The Court: You may be seated, ma'am. They're presently married?
>
> Spectator: No, not now.
>
> The Court: Are they divorced?
>
> Spectator: Yes.
>
> The Court: Pleases step out ma'am.
>
> Defense Counsel: Objection. Will the court rule on my objection?
>
> The Court: It's overruled.

A. 127–28.

Because Ms. Broome was excluded from the courtroom during the testimony of Mr. Sanchez petitioner claims the Sixth Amendment was violated. Petitioner does not seek review of the trial judge's overarching decision to close the courtroom in some manner. He claims only that "the exclusion of petitioner's ex-mother-in-law was an unreasonable application of *Waller*," and "[b]ecause the court failed to address counsel's suggestion of the use of a curtain around Sanchez," it violated *Wal-*

*ler's* third and fourth prongs. Petitioner's Mem. at 28, 35. This alleged error provides the basis for the petition that now seeks reversal of his conviction. The Second Circuit has observed that,

> [w]e should proceed with some caution before ordering such disproportionate relief in a case in which the trial judge did not "deliberately enforce[ ] secrecy in order to be free of the safeguards of the public's scrutiny," *Levine v. United States,* 362 U.S. 610, 619, 80 S.Ct. 1038, 1044, 4 L.Ed.2d 989 (1960), and in which the error is not of "the sort that risks an unreliable trial outcome and the consequent conviction of an innocent person." *O'Neal v. McAninch,* 513 U.S. 432, 442, 115 S.Ct. 992, 997, 130 L.Ed.2d 947 (1995).

*Brown v. Kuhlmann,* 142 F.3d at 539. Here, that caution requires the rejection of petitioner's effort to have his conviction set aside. For even if petitioner's right to a public trial was violated, the error was harmless and cannot be grounds for the vastly disproportionate remedy of overturning his state conviction on habeas corpus.

 Petitioner contends that "the violation of the constitutional right to a public trial is a 'structural error' warranting remediation regardless of prejudice." Def. Mem. at 36 (quoting *Sevencan v. Herbert,* 342 F.3d 69, 74 (2d Cir.2003)). This is a correct quote, and the Supreme Court itself has referred to violations of the right to a public trial as "structural." *see Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Nevertheless, the Second Circuit has made clear that, *"Fulminante's* list of examples of violations that have been held exempt from harmless error review [does not] mean that any violation of the same constitutional right is a 'structural defect,' regardless whether the error is significant or trivial." *Yarborough v. Keane,* 101 F.3d

894 (2d Cir.1996), *cert. denied,* 520 U.S. 1217, 117 S.Ct. 1706, 137 L.Ed.2d 831 (1997). To the contrary, only "structural errors" that affect "[t]he entire conduct of the trial from beginning to end" are free from harmless error review and require "remediation regardless of prejudice." *Fulminante,* 499 U.S. at 309, 111 S.Ct. 1246. Thus, "[i]n order to determine whether a particular error is structural 'we must look not only to the right violated, but also at the particular nature, context, and significance of the violation.'" *Brown v. Kuhlmann,* 142 F.3d at 540 (quoting *Yarborough v. Keane,* 101 F.3d 894, 897 (2d Cir.1996)). "[T]he remedy should be appropriate to the violation." *Waller,* 467 U.S. at 49, 104 S.Ct. 2210. It is not sufficient for petitioner to simply recite the word "structural" and expect automatic reversal.

 Indeed, when a defendant is excluded from a portion of his trial, reversal is required only if a fair and just hearing was thwarted by his absence. *See Snyder v. Mass.,* 291 U.S. 97, 107–08, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *United States v. Rivera,* 22 F.3d 430, 438 (2d Cir.1994). This is similar to the harmless error review built into the definition of the substantive right to counsel. "[T]otal deprivation[s]" are the only right to counsel violations the Supreme Court has held to be "structural." *See Fulminante,* 499 U.S. at 309, 111 S.Ct. 1246. Generally, a defendant can obtain relief on the basis of inadequate assistance of counsel only by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner argues that there should be no harmless error standard, built-in or otherwise, for violations of the public trial right where it is members of the public who are

excluded. This argument would create the anomalous situation where a perhaps more egregious violation—the exclusion of a defendant himself from his own trial—is subject to a form of harmless error review but the less egregious violation—where some members of the public are excluded—requires automatic reversal. This argument is not mandated by Supreme Court precedent, and it is foreclosed by Second Circuit law.

In *Yarborough*, a case where a criminal defendant was excluded from a portion of his own trial proceedings, the Second Circuit posed the following hypothetical:

> *Fulminante* notes, for example, that the exclusion of the public, without justification, from the entirety of a crucial seven-day suppression hearing is structural error. *See Fulminante*, 499 U.S. at 310, 111 S.Ct. at 1265 (citing *Waller v. Georgia*, 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 2217 n. 9, 81 L.Ed.2d 31 (1984)). It does not necessarily follow, however, that the Supreme Court would find structural error and automatically vacate a conviction if the judge granted a motion to close the courtroom for a hearing, took a few minutes of innocuous introductory testimony, and then reconsidered, reversed the ruling and reopened the hearing to the public. *Cf. Peterson v. Williams*, 85 F.3d 39 (2d Cir.) (brief and inadvertent continuation of proper courtroom closure, not noticed by any of the trial participants, although not permitted by law did not rise to the level of a constitutional violation), *cert. denied*, 519 U.S. 878, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996).

*Yarborough*, 101 F.3d at 897 n. 1. Indeed, the Second Circuit went on to apply harmless error to the alleged constitutional violation in *Yarborough* not because of the "built-in" harmless error standard, but because "the absence of the defendant from a hearing under these circumstances does not call into question the fundamental fairness of the trial." *Id.* at 898. By this logic, before deciding whether any courtroom closure is a structural error not subject to harmless error analysis by a reviewing court, that court must determine where along the spectrum of violations (if a violation at all) a given courtroom closure falls.

Some guidance as to the spectrum of courtroom closure violations is provided by recent Second Circuit decisions. In *Peterson v. Williams*, the Second Circuit concluded that there was no violation of the public trial right when the courtroom was inadvertently left sealed for several minutes after the testimony of an undercover police officer. 85 F.3d at 44. In *Yarborough*, the Second Circuit concluded that if holding a brief suppression hearing outside the presence of a criminal defendant was an error, any error was harmless beyond a reasonable doubt. 101 F.3d 894. In *Brown v. Kuhlmann*, the Second Circuit concluded that closing the courtroom in the face of a perfunctory objection during the testimony of an undercover police officer whose testimony was largely cumulative, if error, would be harmless beyond a reasonable doubt. 142 F.3d 529. The limited closure here was no less harmless than any of these closures. And because of the excluded spectator's remote relationship with petitioner and the trial judge's concerns for the witness's safety, it is quite different from *English v. Artuz*, where the Second Circuit ruled that, "[t]he unwarranted exclusion of a defendant's family members justifies granting habeas corpus relief," and "harmless error [does] not apply in such circumstances." 164 F.3d 105, 108 (2d Cir.1998).

■ Simply put, the closure here did not implicate the core values underlying the Sixth Amendment and does not trigger automatic reversal. Petitioner was able to

confront every witness against him. As was his family. Petitioner's ex-mother-in-law was allowed to attend the entire trial with the exception of one witness whose name and the substance of whose testimony— according to petitioner himself—she and the rest of the public already knew. Moreover, that testimony was largely redundant (and likely less significant) than the comparable testimony of the undercover police officer to whom petitioner sold the drugs for which he was convicted. *See Brown v. Kuhlmann*, 142 F.3d at 541 (finding significant the cumulative nature of the testimony during which the courtroom was temporarily closed). Finally, the jury was present throughout. This trial was far from an "instrument of persecution." *In re Oliver*, 333 U.S. at 270, 68 S.Ct. 499. If there was a mistake at all, it was an honest mistake made by a trial judge taking steps to protect a witness from what he perceived to be a credible fear of spectators seeing him and later reporting to people who would try to injure him or his family. In the words of the Second Circuit, "[i]f this incident was error, it was of such minimal importance to the fair structure of the criminal proceeding that it cannot fall within *Fulminante's* classification of structural errors." *Yarborough*, 101 F.3d at 898. And because the alleged error could not have had any "substantial and injurious effect or influence in determining the jury's verdict," *id.* at 899 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)), it was harmless. Indeed, it was harmless beyond any doubt.

It is significant that the issue here is not whether harmless error should be applied to public trial right violations on direct appeal, which of course was the issue in *Waller v. Georgia*. 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31. Rather, the issue is whether a harmless error rule should apply in the context of a habeas corpus proceeding. *See Brecht v. Abrahamson*, 507 U.S. at 633–38, 113 S.Ct. 1710 (holding that, in accordance with the "principle that collateral review is different from direct review" and the "absen[ce of] affirmative evidence that state-court judges are ignoring their oath," a broader harmless error review should be applied to constitutional errors claimed in habeas corpus proceedings). There is ample justification for holding that a harmless error analysis applies to the error asserted here, even if such analysis would not be available on direct appeal. Reversing judgments of convictions and ordering new trials, particularly on habeas corpus, is an extreme remedy. In this case, the petition was filed timely within one year of when the judgment of conviction became filed. Nevertheless, the petition comes some eight years after the crime for which petitioner was charged. And as with any case, the passage of time will make it more difficult to prove certain charges, and the trauma of a second trial for participants should not be ignored. *See United States v. Hasting*, 461 U.S. 499, 507, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (explaining that courts should not overlook "the trauma the victims of ... particularly heinous crimes would experience in a new trial, forcing them to relive harrowing experiences now long past, or the practical problems of retrying these sensitive issues more than four years after the events").

Moreover, "[t]he need for the writ as a remedy to deter state courts from violating the Constitution is most compelling where—notwithstanding the absence of prejudice—there is a real possibility 'that state courts might be hostile to the federal law ... at stake.'" *Brown v. Kuhlmann*, 142 F.3d at 543 (quoting *Reed v. Farley*, 512 U.S. 339, 355, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994)). But as the Second Circuit explained at length, "New York does not evince any kind of hostility

to a defendant's right to a public trial" that would warrant federal courts granting habeas petitions as a deterrent mechanism. *Id.* at 543.

> On the contrary, New York law guarantees a defendant a public trial, N.Y. Civ. Rights Law § 12 (McKinney 1992) (guaranteeing right to a public trial in state bill of rights); N.Y. Jud. Law § 4 (McKinney 1983) (requiring that all judicial proceedings be public except in limited circumstances), and the New York appellate courts have been particularly vigilant in correcting errors involving partial courtroom closures.

*Id.* at 543 (noting that in the decade before 1998, "New York appellate courts ... reversed convictions on the basis of violations of the Public Trial Clause in no fewer than fifty cases," dozens of which are listed). "We have no more reason to suppose that the [New York courts] seek[ ] to undermine the [public trial right] than we have to suppose that it seeks to undermine any other law of [New York]." *Reed v. Farley,* 512 U.S. at 355, 114 S.Ct. 2291. At the very least, the conscientious approach consistently taken by New York courts in this case and others involving the right to a public trial counsels deference—not automatic reversal—on the part of federal courts when reviewing habeas petitions.

In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), where the Supreme Court created a good faith exception to the exclusionary rule, Justice Blackmun wrote the following in his concurring opinion:

> As the Court's opinion in this case makes clear, the Court has narrowed the scope of the exclusionary rule because of an empirical judgment that the rule has little appreciable effect in cases where officers act in objectively reasonable reliance on search warrants. Because I share the view that the exclusionary rule

is not a constitutionally compelled corollary of the Fourth Amendment itself, I see no way to avoid making an empirical judgment of this sort, and I am satisfied that the Court has made the correct one on the information before it. ... What must be stressed ... is that any empirical judgment about the effect of the exclusionary rule in a particular class of cases necessarily is a provisional one. By their very nature, the assumptions on which we proceed today cannot be cast in stone. To the contrary, they will now be tested in the real world of state and federal law enforcement, and this Court will attend to the results. If it should emerge from experience that, contrary to our expectations, the good faith exception to the exclusionary rule results in a material change in police compliance with the Fourth Amendment, we shall have to reconsider what we have undertaken here. The logic of a decision that rests on untested predictions about police conduct demands no less.

*Id.* at 927–28, 104 S.Ct. 3405 (Blackmun, J. concurring) (internal citations omitted). These words are relevant here. The reversal of a conviction, particularly in a habeas proceeding, because of an inadvertent and harmless error in a partial courtroom closure is not a "compelled corollary" of the Sixth Amendment right to a public trial. Nor is there any reason to believe that the remedy of reversal on direct appeal that the New York courts consistently afford is insufficient to ensure the right to a public trial. On the contrary, the empirical evidence suggests that the existence of habeas corpus review is simply not necessary for New York state cases concerning the public trial right that involve no more than an erroneous and harmless partial closure during the testimony of a single witness. If this empirical judgment turns out to be wrong, and a "material change"

in the conscientious application of the public trial right results, it would be cause to "reconsider what we have undertaken." *Id.*

### Conclusion

The petition for a writ of habeas corpus is denied. I grant a certificate of appealability.

**SO ORDERED.**