**Uniko CARSON Petitioner–Appellant,**

v.

**Brian FISCHER, Superintendent, Sing Sing Correctional Facility, Eliot L. Spitzer, New York State Attorney General Respondents–Appellees.**

**Docket No. 04–3018–PR.**

United States Court of Appeals, Second Circuit.

Argued: May 27, 2005.

Decided: Aug. 23, 2005.

Amy Irene Donner (Andrew C. Fine, on the brief), The Legal Aid Society, Criminal Appeals Bureau, New York, NY, for Petitioner–Appellant.

Traci R. Wilkerson, Assistant District Attorney (John M. Castellano, Assistant District Attorney, on the brief), for Richard A. Brown, District Attorney, Queens County, Kew Gardens, NY, for Respondents–Appellees.

Before: CALABRESI, KATZMANN, B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

This appeal requires us to consider whether, when a defendant's ex-mother-in-law is excluded from a limited portion of a criminal trial that is attended by other members of the defendant's family, law enforcement personnel, counsel, and a jury, the Sixth Amendment's public trial guarantee requires granting habeas corpus relief absent particularized findings justifying the exclusion. While the Sixth Amendment generally requires specialized findings before family members and friends can be excluded, under the unique circumstances presented here, we conclude that the trial court's refusal to admit the ex-mother-in-law was so trivial as not to constitute a constitutional violation.

Petitioner Uniko Carson appeals from a judgment of the United States District Court for the Eastern District of New York (Korman, C.J.), denying his petition for a writ of habeas corpus following his conviction for selling cocaine. See N.Y. Penal Law § 220.43[1]. He contends that his right to a public trial was violated when the state trial court effected a limited courtroom closure during the testimony of a confidential informant. Carson argues that the trial court's alleged failure to consider reasonable alternatives to closure, and its refusal to admit his ex-mother-in-law during the informant's testimony constitute an unreasonable application of Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), entitling him to habeas relief. See 28 U.S.C. § 2254.

The District Court denied the habeas petition on the ground that any error resulting from the trial court's exclusion of Carson's ex-mother-in-law was harmless. We affirm, though on different grounds. We hold that the harmless error doctrine does not apply. However, we affirm because we find that the error was not substantial enough to undermine the values furthered by the Sixth Amendment's public trial guarantee.

## BACKGROUND

In August 1996, the New York City Police Department ("NYPD") began a year-long investigation into narcotics trafficking in the Lefrak City apartment complex in Queens. The NYPD enlisted the aid of a drug dealer named Larry Sanchez, who agreed to arrange "buy and bust" drug sales involving Petitioner and several co-defendants, and an undercover detective. On September 17, 1996, undercover detective Frank Patinella met Sanchez and Petitioner at a pre-arranged location in Queens. A livery cab pulled up carrying Sanchez and Petitioner. Patinella got into the cab and told Petitioner what he wanted. Petitioner handed him a brown bag containing more than two ounces of cocaine, and Patinella handed Petitioner $2,200 in pre-marked bills. On March 28, 1997, Patinella identified Petitioner in a line-up. Similar "buy and bust" sales took place with Petitioner's co-defendants.

## A. The Trial

Carson and co-defendant Leroy Williams proceeded to a jury trial before the Supreme Court, Queens County.[1] During its direct case, the State sought to close the courtroom during Sanchez's testimony. Defense counsel objected on the ground that the State had already elected to reveal Sanchez's name, and that it was known in the courtroom and Lefrak City that Sanchez would be testifying against Carson and Williams. The court conducted a hearing pursuant to *People v. Hinton,* 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (1972), to determine whether a closure was necessary to protect Sanchez and his family's safety.

Sanchez testified at the *Hinton* hearing that from August 30, 1996 to March 4, 1997, he had cooperated with the NYPD in their Lefrak City investigation. Around March of 1997, shortly after numerous arrests had been made, Sanchez learned that his girlfriend and her family members had been threatened several times and told that they would be killed if he testified. The mother of one of his daughters also received threats, in which she was told that Sanchez would die if he testified. In addition, someone approached the mother's cousin with a razor and threatened to cut the cousin's "snitch bitch" throat. Sanchez also gave detailed testimony about several occasions on which he was personally threatened and attacked because of his cooperation.

Although Sanchez no longer lived in Lefrak City, he had relatives and friends who did. Sanchez testified about his fear of endangering his family's safety if he testified in an open courtroom. He believed that a closed courtroom would protect his family's safety because people could then only speculate as to the contents of his testimony. He also believed he would be more nervous if the courtroom were open and would consequently have difficulty remembering details.

After hearing argument from both sides, the court granted a limited courtroom closure during Sanchez's testimony. The trial judge explained that "there is no doubt in my mind that [Sanchez] is terrified and there is no doubt in my mind that his fears are not generalized fears but very, very specific, so specific that he says that one of the people that allegedly abused him was someone that he had seen with defendant Williams." The court ruled that "[b]ecause of threats to the witness, to his family, actual acts done, the increased exposure to people who haven't seen him for a long time, the size of the audience and obvious affinity for the defendants that many of the spectators have shown … [and] the fact [that] the man has been in a Witness Protection Program … it seems to me that there is an overriding State interest." However, the court denied the State's motion for full closure, instead ordering that members of the defendants' immediate families, as well as members of the bar and law enforcement officers, could stay for Sanchez's testimony.

Defense counsel objected to this ruling and urged the court to consider alternatives to courtroom closure, such as "a disguise for this witness or some sort of curtain application around the witness box or something that gives this witness his request for privacy." The court responded: "In my view I've made a sensitive accommodation. I don't think requiring the man to testify with a paper bag over his head is the answer here, and it would have a deleterious effect upon the assessment of his credibility; the jurors would

---

1. Two other co-defendants pled guilty.

have trouble looking [sic] and observing his demeanor."

The court then allowed family members who wished to be present for Sanchez's testimony to identify themselves to the court. The court admitted Carson's brother, son, mother, and fiancée, as well as three individuals who identified themselves as Williams's first cousins.[2] The court denied entry, however, to Dolores Broome, who was Carson's ex-mother-in-law and the grandmother of his son. The following colloquy occurred:

> The Court: Yes ma'am?
>
> A Spectator: Dolores Broome, I'm Unicko [sic] Carson's mother-in-law.
>
> The Court: You say you're his mother-in-law? Your daughter—
>
> A Spectator: Was his wife. That's my grandson.
>
> The Court: Your daughter is his legal wife?
>
> A Spectator: Yes, and that's my grandson.
>
> The Court: You may be seated, ma'am. They're presently married?
>
> A Spectator: They're not together now.
>
> The Court: Are they married?
>
> A Spectator: No, not now.
>
> The Court: Are they divorced?
>
> A Spectator: Yes.
>
> The Court: Please step out, ma'am.

Sanchez testified for three days in a trial that lasted about one month. He described, among other things, the drug sale he arranged between Petitioner and Patinella on September 17, 1996. Patinella also testified about the events of September 17 and about his identification of Carson in a line-up the following March. The jury convicted Petitioner of first degree criminal sale of a controlled substance, and he was sentenced to an indeterminate prison term of fifteen years to life. *See* N.Y. Penal Law § 220.43[1].

## B. Direct Appeal

Carson appealed to the Appellate Division on several grounds, including that the trial court's partial closure of the courtroom during Sanchez's testimony violated his Sixth Amendment right to a public trial. The Appellate Division affirmed Carson's conviction, concluding that the partial closure of the courtroom during Sanchez's testimony did not deprive Carson of his right to a public trial. *People v. Carson*, 292 A.D.2d 461, 740 N.Y.S.2d 346 (2d Dep't 2002). The court held that:

> [t]he record of the *Hinton* hearing shows that all four prongs of the test articulated by the Supreme Court in *Waller v. Georgia* were satisfied. First, since the informant testified at the hearing as to specific incidents of actual violence and threats aimed at him in connection with this case, there was an overriding interest in protecting the informant's safety. Second, the closure was no broader than necessary to protect that interest. Third, the court considered and used an alternative to complete closure. Finally, the court made findings of facts on the record to support the partial closure of the courtroom. Accordingly, the court's limited closure of the courtroom during the informant's testimony was a provident exercise of discretion.

*Id.* at 461–62, 740 N.Y.S.2d 346 (citations omitted).

Petitioner sought leave to appeal to the New York Court of Appeals, but the application was denied. *People v. Carson*, 98

---

2. One of the individuals who identified himself as Williams's cousin was later held in criminal contempt when it was discovered that he was not actually related to Williams.

N.Y.2d 673, 746 N.Y.S.2d 462, 774 N.E.2d 227 (2002).

## C. Habeas Corpus Petition

In September 2003, Carson petitioned for a writ of habeas corpus, claiming that he was denied his right to a public trial when the state court (a) closed the courtroom during Sanchez's testimony without adequately considering Petitioner's suggestions of reasonable alternatives, and (b) excluded Petitioner's ex-mother-in-law without a particularized showing of necessity. In an opinion issued on May 13, 2004 and amended on June 1, 2004, the District Court denied habeas relief on the ground that "any violation of petitioner's rights was harmless and habeas relief would be vastly disproportionate to any violation of petitioner's rights." *Carson v. Fischer*, 317 F.Supp.2d 197, 199 (E.D.N.Y.2004). The court first observed that the minor closure at issue—the exclusion of Petitioner's ex-mother-in-law from one witness's testimony—did not implicate the central purpose of the public trial right. *Id.* at 201. Unlike *In re Oliver*, 333 U.S. 257, 258–59, 68 S.Ct. 499, 92 L.Ed. 682 (1948), and *Waller*, 467 U.S. at 42, 104 S.Ct. 2210, where courts conducted proceedings in the absence of jurors or spectators, the court reasoned that here, the presence of "jurors, along with other members of petitioner's family, insured a public presence notwithstanding the exclusion of petitioner's ex-mother-in-law." [3] *Carson*, 317 F.Supp.2d at 201.

The court then turned to the question of harmlessness. Acknowledging that the public trial right is ordinarily not subject to harmless error analysis, *see Waller*, 467 U.S. at 49 n. 9, 104 S.Ct. 2210, the District Court noted that in *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Supreme Court suggested that only "structural" defects that affect "[t]he entire conduct of the trial from beginning to end" are free from harmless error review. *Carson*, 317 F.Supp.2d at 204. The District Court then proceeded to determine whether Carson's alleged public trial violation was such a defect. *See id.* at 205. The court concluded that the closure "did not implicate the core values underlying the Sixth Amendment," since Petitioner, as well as four family members, were present for all of the witnesses, and Broome was allowed to attend the entire trial with the exception of one witness whose name and the substance of whose testimony she and the public already knew. *Id.* at 205–06. Accordingly, the court held, "if this incident was error, it was of such minimal importance to the fair structure of the criminal proceeding that it cannot fall within *Fulminante*'s classification of structural errors." *Id.* at 206 (quoting *Yarborough v. Keane*, 101 F.3d 894, 898 (2d Cir.1996)). This appeal ensued.

## DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an individual convicted under state law is entitled to habeas corpus relief with respect to a claim that was adjudicated on the merits in state court when "the adjudi-

---

**3.** Though focusing principally on Petitioner's claim concerning his ex-mother-in-law, the District Court briefly acknowledged Carson's additional contention that *Waller* required the trial court to consider the alternatives of using a curtain or disguise. The court found that the "trial judge here sensibly declined the proposed alternatives," noting that the Second Circuit has cautioned that these alternatives "could themselves 'pose substantial risks to a fair trial for the defendant,'" and "has specifically concluded *Waller* does not require a trial judge to consider" them. *Carson*, 317 F.Supp.2d at 203 (quoting *Ayala v. Speckard*, 131 F.3d 62, 71–72 (2d Cir.1997) (en banc)).

cation of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The writ may issue under the "contrary to" clause in two circumstances: (1) if the state court decision applied the incorrect legal standard or rule; or (2) if the state court decision addressed a set of facts "materially indistinguishable" from a relevant Supreme Court case and arrived at a result opposite to that reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 404–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision constitutes an "unreasonable application" of clearly established Supreme Court precedent where the state court either "identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [its] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *See id.* at 407, 120 S.Ct. 1495.

■ Here, the parties agree that the Appellate Division, in relying on *Waller*, applied the correct legal standard. Moreover, since *Waller* involved a full courtroom closure in the context of a suppression hearing, the case is not "materially indistinguishable" from ours. Accordingly, we must decide whether the Appellate Division "unreasonably applie[d]" *Waller*'s four-pronged test for determining when the right to a public trial has been violated. Under *Waller*, a closure does not violate the Sixth Amendment where: (1) the party seeking to close the courtroom advances an overriding interest that is likely to be prejudiced; (2) the closure is no broader than necessary to protect that interest; (3) the trial court considers reasonable alter-natives to closing the proceeding; and (4) the trial court makes adequate findings to support the closure. *See Ayala v. Speckard*, 131 F.3d 62, 69 (2d Cir.1997) (en banc).

## A. Propriety of the Limited Closure

■ Putting aside, momentarily, the question of whether Petitioner's ex-mother-in-law was properly excluded from Sanchez's testimony, it is clear that the limited closure effected by the trial court was, in all other respects, consistent with *Waller*. As the Appellate Division concluded, the trial court's decision to close the courtroom during Sanchez's testimony to everyone but the defendants' immediate families, law enforcement personnel, and the parties' counsel satisfied each of the four prongs of the *Waller* test.

Petitioner concedes that the first prong was met because "the trial court correctly concluded. that the need to protect Sanchez's safety and decrease his fear of testifying constituted an overriding State interest under *Waller*'s first prong." Appellant's Br. at 36. Indeed, Sanchez's detailed testimony about the threats to his family and the actual violence he experienced clearly supported the finding that an overriding interest existed.

■ The closure also was no broader than necessary. "[A] courtroom closure is permissible [under the second *Waller* prong] so long as there is a positive and proportional relationship between (1) the extent of the closure, and (2) the 'gravity' of the interest that assertedly justifies the closure, discounted by the probability of the interest being harmed if the courtroom is not closed." *Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir.2001). Whether a closure is narrow or broad depends on several factors, including its duration, whether the public can learn what transpired while the trial was closed (e.g. through transcripts),

whether the evidence was essential, and whether selected members of the public were barred from the courtroom, or whether all spectators were excluded. *See id.* at 129–30. Here, the closure was relatively narrow, and the interest justifying the closure was (by Petitioner's own admission) grave. Although Sanchez was clearly an important witness and three days of testimony is not insignificant, even in a one-month trial, it is important that the closure occurred only during a single witness's testimony. Moreover, Sanchez's testimony was to some extent cumulative of Detective Patinella's, especially as it pertained to the "buy and bust" that led to Carson's arrest. In addition to being limited in time, the closure was also limited in scope: Several family members, law enforcement personnel, and attorneys were permitted to enter the courtroom. On these facts, we cannot say the court's limited closure order was broader than necessary given the court's substantial interest in protecting Sanchez and his family's safety.

The trial court also fulfilled its obligation under *Waller*'s third prong to consider reasonable alternatives to closure. Defense counsel asked the trial court to consider "a disguise for this witness or some sort of curtain application around the witness box or something that gives this witness his request for privacy." The court responded that it did not believe that "requiring the man to testify with a paper bag over his head is the answer here, and it would have a deleterious effect upon the assessment of his credibility; the jurors would have trouble looking [sic] and observing his demeanor." Petitioner contends that the trial court's response demonstrates that it only considered the possibility of disguising the witness, not the alternative of using a curtain.

We disagree. While the trial court may have only referred to putting a "paper bag" over Sanchez's head, the reasoning underlying its response applied equally to both proposed alternatives. Although Petitioner now contends that a curtain could have been placed in a way that would have permitted the jury to see Sanchez, at trial, defense counsel only specifically suggested placing a curtain "around the witness box." Like a disguise, this would have impaired the jury's ability to see the witness and assess his credibility. Thus, the court's concern that "jurors would have trouble looking and observing his demeanor" was responsive to both suggested alternatives. Furthermore, the trial court was not obligated to consider putting the curtain in any position other than what defense counsel specifically suggested—that is, "around the witness box." As we have previously held, a trial judge need not consider alternatives to a limited closure *sua sponte. See Ayala,* 131 F.3d at 71. Here, the trial court adequately considered those alternatives that defense counsel actually proposed at trial.

Finally, the trial court made adequate findings to support its decision to effect a limited closure. The purpose of the fourth *Waller* prong is simply to allow a "reviewing court [to] determine whether the closure order was properly entered." *Woods v. Kuhlmann,* 977 F.2d 74, 77 (2d Cir.1992) (quoting *Waller,* 467 U.S. at 45, 104 S.Ct. 2210). Here, the trial court made extensive findings concerning the threats against Sanchez and his family, as well as why the court believed it was appropriate to close the courtroom to all spectators other than family members, members of the bar, law enforcement, and court officers. Certainly, these findings suffice to allow us to "determine whether the closure was properly entered." *Woods,* 977 F.2d at 77 (citation omitted). Moreover, we held in *Bowden* that "[t]he quality and

extent of the evidence that will support a closure ... will vary from case to case, depending on the scope of the closure." *Bowden,* 237 F.3d at 131. Thus, a trial judge's findings may adequately support a "very limited" closure even if they are "neither entirely accurate nor particularly compelling." *Id.* at 132. Here, however, the trial court's findings, even for a limited closure, were both accurate and compelling. Accordingly, the fourth *Waller* prong was met.

Thus, when we leave aside the exclusion of Petitioner's ex-mother-in-law, we easily conclude that the *Waller* test was satisfied. We agree with the Appellate Division that "the court's limited closure of the courtroom during the informant's testimony was a provident exercise of discretion." *Carson,* 292 A.D.2d at 462, 740 N.Y.S.2d 346.

### B. Propriety of Excluding Petitioner's Ex–Mother–In–Law

█ The question, then, is whether the trial court's refusal to admit Petitioner's ex-mother-in-law during Sanchez's testimony converted a constitutional closure into an "unreasonable application" of *Waller.* Petitioner argues that the exclusion of Broome ran afoul of the second *Waller* prong by making the closure broader than necessary, and that the fourth prong was not satisfied because the trial court did not make adequate findings to justify the ex-mother-in-law's exclusion. Although we hesitate to suggest that the exclusion of a former family member is a trivial matter, we believe that under the particular circumstances presented, Broome's exclusion was insufficiently substantial to implicate the Sixth Amendment, and, for this reason, we find that the state court did not unreasonably apply *Waller.*

#### i. *Exclusion of Family Members and Friends*

█ As Petitioner observes, this Court takes very seriously a defendant's right to have family members and friends present at his trial. "The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly." *Guzman v. Scully,* 80 F.3d 772, 776 (2d Cir.1996). Our heightened interest in the exclusion of family members and friends derives from *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948), where the Court "specifically noted a special concern for assuring the attendance of family members of the accused." *Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994) (citing *Oliver,* 333 U.S. at 271–72 & n. 29, 68 S.Ct. 499).

In accordance with this special concern, we granted habeas relief in several pre-AEDPA cases on the ground that the exclusion of family members without a particularized inquiry into whether the exclusion was necessary to advance an overriding interest violated the Sixth Amendment. *See English v. Artuz,* 164 F.3d 105 (2d Cir.1998); *Guzman,* 80 F.3d at 776–77; *Vidal v. Williams,* 31 F.3d at 69. In *English,* for example, we concluded that the trial court failed to satisfy the second and fourth prongs of *Waller* when it refused to allow the petitioner's family members to remain in the courtroom during an informant's testimony even though the informant admitted that he would be willing to testify in front of them. *See English,* 164 F.3d at 109–10. The closure was broader than necessary, we concluded, because of that willingness. *See id.* Moreover, the trial court failed to make adequate findings to justify the exclusion of the petitioner's family members. *See id.*

Even in cases decided pursuant to AEDPA, which guides our present inquiry, we have consistently required affording spe-

cial consideration to the presence of a defendant's family members and friends. Most importantly, in *Yung v. Walker*, 341 F.3d 104 (2d Cir.2003), we held that:

> *Waller* prevents a court from denying a family member's request to be exempted from a courtroom closure order unless the court is convinced that the exclusion of that particular relative is necessary to protect the overriding interest at stake. Indeed, it would be an unreasonable interpretation of *Waller* for a court to deny such a request if the exclusion of that particular relative, under the specific circumstances at issue, is not necessary to promote the overriding interest.

*Id.* at 111. Accordingly, we remanded for a hearing as to whether the exclusion of Yung's mother, the mother of his child, and his sister-in-law—the three family members he sought to have admitted—was necessary to promote an overriding interest. *See id.* at 107. Guided by *Yung*, in *Sevencan v. Herbert*, 342 F.3d 69 (2d Cir. 2003), we denied habeas relief only after concluding that the trial court's exclusion of the defendant's wife was necessary to promote an overriding interest because the wife was familiar with her husband's associates, many of whom were highly dangerous, and because she was "likely to be susceptible to requests from her husband's associates to inform them if she spotted the undercover officer." *Id.* at 77.

Against this backdrop, there is merit to Petitioner's claim that the trial court erred in failing to ensure that Broome's exclusion was necessary to protect Sanchez and his family's security. It is clear from the record that Broome was excluded from the courtroom solely on the ground that her daughter and Carson were legally divorced, and thus, she was no longer one of Carson's immediate family members. The court did not inquire into whether Broome lived in Lefrak City, knew anyone in Lef-rak City, or was likely to come into contact with Sanchez. In other words, the court made no particularized inquiry into whether Broome's exclusion was necessary to promote an overriding interest. Moreover, the fact that Broome was no longer legally related to Carson does not, in and of itself, excuse the trial court's failure to make the required inquiry. It would be unduly formalistic to make a defendant's Sixth Amendment rights turn on the legal status of a familial relationship when many families have non-traditional compositions and those individuals to whom a defendant may be closest often will not be blood-relatives. Accordingly, Carson's claim that the state court unreasonably applied *Waller* merits our close attention.

### ii. Trivial Closures

Even an unjustified closure may, in some circumstances, be so trivial as not to implicate the right to a public trial. In *Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996), for example, we held that an inadvertent, half-hour courtroom closure during the defendant's testimony was so trivial that it did not raise Sixth Amendment concerns, especially where the content of the testimony was repeated during defense counsel's summation. We later extended *Peterson*'s triviality analysis in *Brown v. Kuhlmann*, 142 F.3d 529 (2d Cir.1998), finding that a deliberate courtroom closure during a police officer's testimony was "not substantial enough to undermine the values furthered by the public trial guarantee" because the officer's testimony was cumulative of other witnesses' testimony, it concerned a collateral issue, and transcripts of the trial were publicly available. *Id.* at 534, 544.

As we explained in *Peterson*, the question of whether a particular closure implicates the Sixth Amendment turns on whether it undermines the values the

Amendment is aimed to protect. *See Peterson,* 85 F.3d at 43. *Peterson* identified four values that the Supreme Court has said are advanced by the public trial guarantee: "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Id.* (citing *Waller,* 467 U.S. at 46–47, 104 S.Ct. 2210). Because these values were not infringed by the brief and inadvertent courtroom closure that occurred during the petitioner's trial, we concluded in *Peterson* that the Sixth Amendment was not implicated.

Here, too, we believe the values underlying the Sixth Amendment were not implicated despite the trial court's failure to make particularized findings as to whether Broome needed to be excluded. The presence of four of Carson's family members, three of Williams's purported family members, law enforcement personnel, counsel, and members of the jury during Sanchez's testimony clearly safeguarded the first, second, and fourth reasons for the public trial right. This is not a case like *Oliver* or *Waller,* where the court conducted a hearing in the absence of jurors and the public. *See Waller,* 467 U.S. at 42, 104 S.Ct. 2210; *Oliver,* 333 U.S. at 271–72, 68 S.Ct. 499. This case also differs from *Yung:* Whereas in *Yung,* all three of the family members the defendant sought to have admitted were excluded, here, the trial court specifically permitted several of Carson's family members to remain in the courtroom during Sanchez's testimony. *See Yung,* 341 F.3d at 107. Carson's son, mother, brother, and fiancée—those individuals who arguably had the greatest incentive to see that the trial was in all respects a fair one—were present to observe Sanchez's testimony. While Broome might have been important to Carson, she was only excluded after four members of

the defendant's immediate family had been permitted to enter. None of our cases concerning the exclusion of family members and friends, either pre-AEDPA or pursuant to AEDPA, have involved similar circumstances.

Furthermore, as the parties acknowledged at oral argument, counsel on both sides discussed Sanchez's testimony in their summations. Thus, even if Broome was excluded from Sanchez's actual testimony, and even if his testimony was important, Broome still had an opportunity to hear much of its substance. As we noted in *Peterson,* while summarizing testimony in a summation "cannot by itself resolve the Sixth Amendment question[,] ... it does bear on how seriously the values served by the Sixth Amendment were undermined." *Peterson,* 85 F.3d at 43.

With respect to the third value underlying the public trial guarantee, although one could argue that Broome might have been encouraged to come forward had she been allowed to hear Sanchez's testimony, by defense counsel's own admission, the contents of his testimony were already widely known. Moreover, his testimony to a large extent overlapped that of Detective Patinella, who was also present in the livery cab during the "buy and bust," and who identified Carson in a line-up. We believe it is unlikely, therefore, that Broome's exclusion from Sanchez's testimony discouraged any witnesses from coming forward.

Our conclusion that Broome's exclusion does not implicate the Sixth Amendment finds further support in the Seventh Circuit's decision in *Braun v. Powell,* 227 F.3d 908 (7th Cir.2000). There, the court concluded that the exclusion of an excused member of the venire panel throughout a defendant's trial did not implicate the Sixth Amendment. *See id.* at 919. The

trial court had barred the venire member from watching the trial on the ground that it had a policy of excluding all former members of the venire panel from remaining in the courtroom. *See id.* at 910. Relying on our holding in *Peterson,* the Seventh Circuit found that there was "no reason to believe that [the defendant's] trial was any less fair, or that the court officers or witnesses took their roles any less seriously, because of the exclusion of this one spectator." *Id.* at 919. Here, too, we believe the exclusion of a single individual did not implicate the values the Sixth Amendment is aimed to protect, especially where Broome was excluded only during the testimony of a single witness, and not for the duration of the trial as in *Braun.* Although the Seventh Circuit noted that the venire member was not a family member or friend, and accorded some significance to that fact in light of *Oliver, see Braun,* 227 F.3d at 919, we believe that even the exclusion of a family member or friend may, in rare circumstances such as these, not implicate the Sixth Amendment public trial guarantee. On these facts, we cannot conclude that the exclusion of Carson's ex-mother-in-law during a single witness's testimony, when four of the defendant's closest family members, as well as others, were present, rendered unconstitutional a closure that otherwise complied fully with *Waller.*

### iii. Harmless Error Analysis Does Not Apply

■ In concluding that Broome's exclusion was trivial, our analysis differs from that of the District Court, which relied primarily on harmless error analysis. As we explained in *Peterson,* finding that an unjustified closure was too trivial to amount to a violation of the Sixth Amendment is "very different from a harmless error inquiry." *Peterson,* 85 F.3d at 42. Whereas a harmless error inquiry looks to whether the defendant suffered "prejudice" or "specific injury," a triviality inquiry asks "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant— whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment." *Id.* The distinction is not semantical. A finding that a constitutional error was harmless means that there is little likelihood that the result of the trial would have been different even in the absence of the error. *See Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). By contrast, in finding that the trial court's error in excluding Broome without a personalized inquiry was trivial, we are not focused on whether the defendant still would have been convicted without the error or was prejudiced in some other way; instead, we conclude that the error was not significant enough to rise to the level of a constitutional violation.

While the District Court cited *Peterson* and considered whether Broome's exclusion was trivial, it did so in service of a different conclusion than our own. Relying on *Arizona v. Fulminante,* 499 U.S. at 309–10, 111 S.Ct. 1246, in which the Supreme Court indicated that only "structural" defects that affect "[t]he entire conduct of the trial from beginning to end" are free from harmless error review, the District Court asked whether Broome's exclusion was a trivial error in order to decide whether the error rose to the level of a structural defect. *Carson,* 317 F.Supp.2d at 204. Finding that Broome's exclusion "did not implicate the core values underlying the Sixth Amendment," the court concluded that "if this incident was error, it was of such minimal importance to the fair structure of the criminal proceeding that it cannot fall within *Fulminante*'s classification of structural errors." *Carson,* 317

F.Supp.2d at 205–06 (quoting *Yarborough*, 101 F.3d at 898). Finding no structural error, the District Court applied harmless error analysis and concluded that the error was harmless. Accordingly, the court held that Petitioner was not entitled to habeas relief.

Although we agree with the District Court that any error was of minor significance, we disagree with its use of harmless error analysis. In *Waller*, the Court explicitly held that a defendant should not be required to prove specific prejudice to obtain relief for a violation of the right to public trial, 467 U.S. at 49–50 & n. 9, 104 S.Ct. 2210, and in *Fulminante*, the Court listed the deprivation of the right to a public trial as a "structural" error to which harmless error analysis does not apply, 499 U.S. at 310, 111 S.Ct. 1246. Although this Court has, on occasion, suggested that some violations of the public trial right may not rise to the level of a structural defect, *see Brown*, 142 F.3d at 539–40 (citing cases), we have never held that harmless error analysis is appropriate when a family member or friend has been excluded. Indeed, we have consistently held that prejudice is unnecessary in that context. *See, e.g., English*, 164 F.3d at 108 ("The unwarranted exclusion of a defendant's family members justifies granting habeas corpus relief, and petitioner need not show prejudice."); *Guzman*, 80 F.3d at 776 ("[I]t is well-settled that a defendant whose right to a public trial has been violated need not show that he suffered any prejudice, and the doctrine of harmless error does not apply."); *Vidal*, 31 F.3d at 69 (noting that "the petitioner need not show prejudice").

Indeed, there is good reason to be wary of invoking the harmless error doctrine with respect to the public trial guarantee. In *United States v. Canady*, 126 F.3d 352 (2d Cir.1997), we concluded that the trial court's failure to announce the verdict publicly was a structural error; therefore, harmless error analysis did not apply. As we explained, "if we were to hold that the error was not structural and thus subject to harmless error analysis, it would almost always be held to be harmless. In this way, the right would become a right in name only, since its denial would be without consequence." *Id.* at 364. The same concern arises with respect to the exclusion of family members and friends: Because it would be, in most cases, virtually impossible for a defendant to demonstrate that the absence of family members or friends from his trial affected its result, a defendant's Sixth Amendment right to have them in attendance, absent overriding grounds for their exclusion, could well "become a right in name only" if the defendant were required to show prejudice. We strongly doubt this is what the Supreme Court had in mind in *Oliver* when it emphasized the defendant's right to have family members and friends at trial. Consequently, we reject harmless error analysis in this context.

## CONCLUSION

Because the state trial court's limited closure order was consistent with *Waller* and the exclusion of Petitioner's ex-mother-in-law was not sufficiently substantial to implicate the Sixth Amendment, the District Court's decision is AFFIRMED.